E. A. GREGORY, Vonna Jo Gregory, Thomas L. Brown, M. D., John B. Coleman and First Bank of Macon County, a Banking Corporation, Plaintiffs,

v.

Dennis M. MITCHELL, Individually and in his capacity as Alabama State Superintendent of Banks and as Chairman and Ex Officio a Member of the Alabama State Banking Board, Herman Watson, A. M. Grimsley, Jr., Feagin Rainer, M. R. Crump, H. T. Strother, and Hayse McGahey, Individually and as Members of said Banking Board, First Alabama Bancshares, Inc., a Bank Holding Corporation, First Alabama Bank, N. A., a Banking Corporation located in Notasulga, Alabama, Federal Deposit Insurance Corporation, a corporation created and existing under and by virtue of an Act of Congress, and United States of America, all Individually and Jointly, Defendants.

Civ. A. No. 78–43–N.

United States District Court,
D. Alabama, N. D.

April 27, 1978.

On Motion for Reconsideration
Sept. 5, 1978.

Ira DeMent, James Jerry Wood, and Richard H. Sforzini, Jr., Montgomery, Ala., for plaintiffs.

R. E. Steiner, III, Montgomery, Ala. (Steiner, Crum & Baker), Montgomery, Ala., for defendants Mitchell, Watson, Grimsley, Rainer, Crump, Strother, and McGahey.

Charles M. Crook and T. W. Thagard, Jr., Montgomery, Ala. (Smith, Bowman, Thagard, Crook & Culpepper), Montgomery, Ala., for F. D. I. C., First Alabama Bank, N. A., Notasulga, Alabama, and First Alabama Bancshares, Inc.

Barry E. Teague, U. S. Atty., and Kenneth E. Vines, Asst. U. S. Atty., M. D. Ala., Montgomery, Ala., for the United States.

### MEMORANDUM

JOHNSON, Chief Judge.

This is an action brought pursuant to 42 U.S.C. § 1983 by plaintiffs First Bank of Macon County and its major stockholders, E. A. Gregory, Vonna Jo Gregory, Thomas Brown, and John B. Coleman, who allege that their constitutional rights to due process and equal protection were violated when the Macon County Bank was closed and its assets sold. Defendants are Dennis Mitchell, Alabama Superintendent of Banks; the members of the State Banking Board; First Alabama Bancshares, Inc.; First Alabama Bank, N.A.; Federal Deposit Insurance Corporation (FDIC); and the United States of America. Jurisdiction is based on 28 U.S.C. § 1343. The action is submitted for consideration of motions to dismiss, or alternatively for summary judgment, filed by several defendants.

The following facts are undisputed. In 1974, plaintiff E. A. Gregory purchased controlling blocks of stock in several small town, state-chartered banks in Alabama, including plaintiff First Bank of Macon County. On July 16, 1976, M. Douglas Mims, then Superintendent of Banks, wrote to the bank's board of directors, listing various expenses and purchases which, in the opinion of the State Banking Department's legal counsel, constituted "unsafe and unsound banking practices" within the meaning of Ala.Code §§ 5–10–23 and 5–10–24. The directors later agreed to abide by the department's order that such practices be

stopped. The FDIC examined the bank in early 1977; the examination report, delivered to the board of directors in June, revealed that the bank still was engaging in unauthorized and illegal practices. As a result, charges were instituted against the bank, and, eventually, a cease and desist order was entered.

When, in December, 1977, all of the bank's non-employee directors resigned, defendant Mitchell, as the Superintendent of Banks, ordered that the bank be examined again. According to the examiner's report, the condition of the bank was "critical." Among other problems, the bank did not have a legally constituted board of directors; it was being operated in "flagrant disregard of applicable laws and regulations;" it had a $207,900 deficit in its capital account; and it was expected to have a negative cashflow for the coming year. On January 17, 1978, Mitchell sent a copy of the examiner's report to the bank's directors, advising them that, based on the report, he had reason to believe the bank "was in an unsafe and unsound condition to transact the business for which it was organized or that it is unsafe for the Bank to continue business." In addition, Mitchell notified the directors that pursuant to Ala. Code § 5–10–24 (authorizing the superintendent to seize the bank upon direction of the state banking board), he was calling a meeting of the State Banking Board on January 26, 1978, to consider the bank's condition, and that they could appear and be heard in person or by counsel. Plaintiffs admit they received this notice.

On January 19, 1978, the bank's attorney wrote to Mitchell, requesting a continuance on the grounds that Gregory had been subpoenaed to appear for a deposition in Florida and that Gregory's attorney was scheduled to appear in court on another matter. In response Mitchell advised the attorney that the hearing could be rescheduled for January 25, 1978. The attorney refused this offer. Subsequently, the attorney delivered a second letter to Mitchell, reiterating his request for a continuance. The attorney further requested that any action by the banking board be deferred until Gregory had a "reasonable opportunity to sell the bank to new owners." These requests were denied.

The State Banking Board met as scheduled on January 26, 1978. Counsel for the bank attended and participated. However, neither Gregory nor any other bank director or officer appeared. At the hearing, the Board discussed with Gregory's attorney the reasons why no officials or other representatives for the bank were in attendance, the bank examiner's report on the condition of the bank, and the Gregorys' prospects of selling the bank. In addition, the Board heard testimony from Richard Doughty, who was in charge of the bank examination. Shortly after the hearing adjourned about noon, the bank's attorney called Gregory, informing him that the Banking Board was "adamant about closing the Bank." Gregory said, if the board desired, he could be in Montgomery by 2:30 p. m. with the bank's president, vice-president, and secretary to the board of directors. When Gregory's request was relayed to the Board, it unanimously voted not to wait for Gregory's belated arrival before making a decision because, as stated in the minutes of the Banking Board, "the hearing had already been held." The bank's attorney then called Gregory to tell him of the Board's decision not to wait, and, in addition, to tell him the Board was particularly concerned with the number of "out of territory" loans issued by the bank. Gregory promised that he would "move out" all such loans if given ten more days. His request for more time was denied by the Board.

Shortly thereafter, the Banking Board unanimously voted to authorize Mitchell to seize the bank, which he did at 4:30 p. m. Pursuant to Ala.Code §§ 5–10–34, 5–8–3, Mitchell appointed FDIC as his agent in the liquidation of the bank and as the bank's receiver. FDIC accepted the appointment as authorized by 12 U.S.C. § 1821(e). To confirm its status as receiver, FDIC filed an ex parte petition in the Circuit Court of Macon County, Alabama, which was granted on January 27, 1978. The following day, the court also approved an ex parte sale of the bank's assets made to First Alabama Bank, N.A., pursuant to a "purchase and assumption transaction" set up by FDIC.

Plaintiffs contend that, by seizing the bank and selling its assets, Superintendent Mitchell and the members of the State Banking Board, as part of a conspiracy with defendants FDIC, the United States, First Alabama Bancshares, Inc., and First Alabama Bank, N.A., deprived them of their property without notice and an opportunity to be heard, in violation of the due process clause of the Fourteenth Amendment and 42 U.S.C. § 1983. Plaintiffs further contend that they were denied equal protection of the laws and substantive due process [1] because the report of the examination of the bank relied upon by the Banking Board was prepared by biased examiners, who knowingly applied "stricter standards" to the bank than to other banks, and because the attorney for the Banking Board overzealously urged the Board to seize the bank. Moreover, plaintiffs assert various contentions arising under state law. The following relief is requested: (1) a declaration that their constitutional rights have been violated; (2) $10,000,000 damages; and (3) an order voiding the sale of the bank's assets.

Each of the defendants has moved for dismissal, or, with the exception of the United States, alternatively for summary judgment. Upon consideration of these motions, supporting affidavits, the parties' briefs, and other pleadings, it is the conclusion of this Court that the motions to dismiss filed by FDIC and the United States and the motions for summary judgment

filed by the other defendants should be granted.

It is well established that neither officers nor stockholders, even controlling stockholders, can maintain an action to redress an injury to the corporation even though the value of their stock is impaired as a result of the injury. *Schaffer v. Universal Rundle Corp.*, 397 F.2d 893 (5th Cir. 1968); *Erlich v. Glasner*, 418 F.2d 226 (9th Cir. 1969) (action based on 42 U.S.C. § 1983). Since only the bank has allegedly suffered any injury in this case, all of the individual plaintiffs must be dismissed.[2] Moreover, the bank should also be dismissed since, as plaintiffs concede in their brief filed March 30, 1978, "[a]ny action to be maintained on behalf of the Bank is properly to be brought by the State Superintendent or the FDIC." Plaintiffs request that they be given leave to amend their complaint in order to file a derivative action pursuant to Rule 23.1, Federal Rules of Civil Procedure. Yet, to permit plaintiffs so to amend their complaint would but permit them to do a futile act; even if plaintiffs were properly before the Court, it affirmatively appears from the record that they would not be entitled to any relief. Accordingly, leave to amend will be denied.[3]

I. *Procedural Due Process Claim*

Plaintiffs' claim that they were denied procedural due process is frivolous. Summary seizure of a bank—*i. e.,* seizure without a prior hearing—has been approved by many courts, including the Supreme

---

1. Although plaintiffs' contentions are couched in equal protection language, some are better treated as matters of substantive due process.

2. The Gregorys argue that they fall within an exception to the general rule barring stockholders' suits, which permits such suits "where the stockholder shows a violation of duty owed directly to him," *Schaffer v. Universal Rundle Corp., supra,* because defendants allegedly conspired to clear them out of the banking business. The Gregorys, however, chose to carry on their banking business in the ·corporate form. Consequently, defendants owed no duty directly to the Gregorys, who were but stockholders. To hold otherwise would ignore the corporate entity.

3. Under the provisions of the Federal Tort Claims Act, an action against the United States or a federal agency cannot be instituted for money damages caused by the wrongful act of a government employee "unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing . . . ." 28 U.S.C. § 2675(a). As a federal agency, FDIC is within the coverage of the Act. *Safeway Portland Employees Federal Credit Union v. FDIC,* 506 F.2d 1213 (9th Cir. 1974). Since plaintiffs admit in their complaint that they have failed to exhaust the procedures set out in the Act, even if plaintiffs brought this action as a stockholder's derivative suit, this Court would lack jurisdiction of their claims against FDIC and the United States.

Court of the United States, on the ground such action is justified by the potential economic disaster of a bank failure. *See Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Fahey v. Mallonee*, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947); *In re Franklin National Bank*, 381 F.Supp. 1390 (E.D.N.Y.1974). Even assuming plaintiffs were entitled to a hearing, there is no merit to their constitutional complaint. Due process requires no more than notice and an opportunity to be heard. *See, e. g., Fuentes v. Shevin, supra.* It is undisputed that plaintiffs received notice of the hearing and of their opportunity to participate. As a matter of fact, plaintiffs did participate in the hearing through their attorney. Accordingly, they received all the process they were due.

■ This result is not changed by plaintiffs' contention that Superintendent Mitchell and the members of the State Banking Board acted arbitrarily and capriciously by failing to grant their requests for: (1) a continuance to allow them to sell the bank; (2) a ten day continuance to "move out" all the bank's out of territory loans; (3) an opportunity to come to Montgomery immediately after the hearing and appear before the Board; and (4) notice and opportunity to be heard before the bank was sold. The Board's failure to grant these requests did not constitute an abuse of discretion under the circumstances of this case.

Plaintiffs' argument that a continuance was mandated because neither Gregory nor the bank's counsel could attend the hearing is a sham. In an attempt to avoid the scheduling conflicts, Mitchell offered to reschedule the hearing, but his offer was refused. Further, Gregory apparently made no attempt to change the date of his deposition. Most importantly, other bank officers and directors could have represented the bank.[4] Presumably, they had no schedule conflicts since Gregory stated at noon on the day of the hearing that he would have the bank's president, vice-president, and

secretary of the board of directors in Montgomery by 2:30 p. m. Certainly G. W. Atkinson and Russell Richardson were qualified to appear before the Board; each has filed affidavits in this case indicating he had personal knowledge of the bank's financial situation and the events occurring during examination of the bank. Moreover, faced with a pending bank failure documented by the examiner's report, the Banking Board was obligated to take immediate action to prevent serious harm to the public. Granting plaintiffs' requests for continuances could well have increased the risk of such harm. The failure to grant the requests thus was not arbitrary or capricious. Similarly, the sale of the bank's assets without notice was not a denial of due process. The "taking" of the bank's property occurred when the bank was seized. The state need not provide notice and opportunity to be heard at each stage of the liquidation process.

II. *Equal Protection and Substantive Due Process Claims*

■ In an affidavit filed March 30, 1978, Gregory states that on December 27, 1977, before the examination report had been prepared, he informed Superintendent Mitchell that the examination of the bank had been "very biased and unfair," and requested he be allowed to meet with the examiners, a request which Mitchell approved. Gregory and others met with Richard Doughty, head examiner for the State Banking Department, Lamar Kelly of FDIC, and several other examiners during the first week of January. During the meeting, Gregory disputed many of the examiners' findings, presenting what he believes was convincing evidence in support of his position. Yet the examiners refused to change their report. Gregory argues that such refusal on the part of the examiners was arbitrary and capricious and denied him equal protection of the law because stricter standards were applied to the Macon Bank than to other banks.[5]

---

4. The bank was organized in the corporate form. Accordingly, any right to be heard at the hearing belonged to the corporation as a whole, not to the Gregorys, who were but controlling stockholders.

5. Gregory does not limit his complaints to the events of the 1977 state examination. In his affidavit filed March 30, 1978, he states: "There is no question that during the entire course of this examination, and as a matter of

It is clear that the examiners did not act arbitrarily and capriciously. Indeed, almost all of their general conclusions are supported by the cease and desist order entered by FDIC on January 25, 1978.[6] Even assuming that the bank examiners were arbitrary and capricious and applied overly strict standards to the Macon bank, however, it affirmatively appears plaintiffs were not denied equal protection or substantive due process. The decision to seize plaintiffs' bank was made not by the bank examiners, but by the members of the State Banking Board. No allegation has been made that the Board was biased against plaintiffs or treated them differently than any other similarly situated bank.[7] Yet, if the Banking Board's actions were based on a foundless report, presumably plaintiffs would have a substantive due process claim—*i. e.*, although acting innocently, the Board unreasonably deprived plaintiffs of their property without valid cause. This Court, however, will not intrude into the decision-making process of the Banking Board under the guise of substantive due process. As long as its decision was based on "substantial evidence," which in this case means evidence untainted by any alleged bias of the examiners, it will not be overturned. *Cf. Blunt v. Marion County School Board*, 515 F.2d 951 (5th Cir. 1975).

There is no doubt substantial evidence supported the Banking Board's decision, even if the evidence challenged by plaintiffs on the ground the examiners were biased is ignored.[8] For instance, the examination report reveals the bank violated certain banking regulations by, *inter alia*, issuing certificates of deposit bearing an interest rate above that permitted by law, failing to include a "bankruptcy clause" in its lease agreements, failing to include a "purpose statement" on certain loans, and failing to maintain a record of insider transactions.[9] Further, two of the three major problems highlighted by Superintendent Mitchell in his presentation to the Banking Board are not subject to plaintiffs' allegations of bias

fact since early 1976, the Bank Examiners have without question in both capacities, both FDIC and the State Banking Department gone after us on a vindictive-type situation where they were out to literally close us out of the banking business." It should be noted that beginning in early 1976, both the State Banking Department and FDIC found that the Gregorys were engaging in illegal and unsound banking practices. Until now, Gregory has never suggested these authorities were wrong. Indeed, in 1976, the Gregorys agreed to end many of the practices challenged by the Banking Board.

6. For instance, the FDIC order noted that the bank had "extended and maintained an excessive and disproportionately large volume of poor quality loans and overdue loans in relation to its total assets," Cease and Desist Order (Jan. 25, 1978) at 8; that it had inadequate capital protection, *id.*, at 9; that it was exceeding legal lending limits, *id.*; and that its management, especially the Gregorys, was engaged in extensive self-dealing, *id.*

7. In their latest briefs, plaintiffs aver that all of the defendants conspired against the Gregorys. Presumably that would include the members of the Banking Board. However, the factual allegations of the complaint are aimed only at the bank examiners, as are all of plaintiffs' affidavits. Since plaintiffs have not alleged that any of the defendants have any casual connection with the activities of the bank examiners, they cannot be liable for the examiners' actions. *See Sims v. Adams*, 537 F.2d 829 (5th Cir. 1976).

8. Indeed, in his summation at the hearing, the bank's counsel virtually endorsed seizure of the bank if the Gregorys could not sell it. He stated: "My main purpose is to try, in asking this Board for some more time, to see if we can't sell the bank without putting a black eye on the State of Alabama and banking in the State of Alabama. I realize that you can't restrict, really, who buys stock in a bank. And we try to restrict who becomes lawyers, but we get some bad ones, don't we . . .? We try to get rid of them the best and easiest way you can. I just think it would be in the best interest of the State and banking if we could sell the bank and get these people out of it. If that can't be done, this Board will have to do what it has to do." Transcript at 33.

9. Gregory asks the Court to discount these violations on the grounds that they are commonly committed by other banks. See Affidavit (filed March 30, 1978) at 9. There is no reason, however, why such violations could not be considered by the Banking Board, especially in light of the bank's past record.

on the part of the examiners.[10] For example, Mitchell expressed grave concern over the bank's lack of "liquidity." In other words, so many loans had been made that if a few large depositors withdrew, the bank would have been unable to meet its obligations. Second, Mitchell stated that he was "appalled" by the number of "out of territory" loans which the bank continued to make despite criticism from FDIC and the Banking Board.[11] Either of these problems alone would have justified seizure of the bank.[12]

■ In addition to the fact that the Board's decision was amply supported by unchallenged evidence, another factor requires granting summary judgment against plaintiffs on their substantive due process and equal protection claims. The proper forum to hear challenges to the findings of the bank examiners' report was the State Banking Board, whose members are experts in the evaluation of such documents. Plaintiffs were given the opportunity to present their case to the Board. Had plaintiffs taken advantage of the opportunity afforded them, they could well have persuaded the Board the examiners were wrong, thus

10. These two problems are detailed in the examiners' report. Unlike the classification of loans or computation of capital requirements, evidence of the two problems is provided by unchallenged statistics not dependent on the examiners' discretion.

11. On December 17, 1977, the day of the examination, out of territory loans comprised over 45 percent of the total loans of the bank (measured by dollar volume). See Examiners' Report at 3–e. Although many of the out of territory loans were classified, it was the number of such loans, rather than their status, which concerned Mitchell. See Transcript at 15. With so many out of territory loans, it was feared the bank was unable to adequately serve the local community. Id.; see Examiners' Report at 1-a-1.

12. Under Alabama law, seizure of a bank upon order of the Banking Board is authorized, inter alia, when the bank violates its charter, conducts business in an unauthorized manner, is insolvent, has refused to observe any order of the superintendent, or is in an unsound or unsafe condition. Ala.Code § 5--10 -24.

13. This conclusion does not run afoul of the general rule that exhaustion of state administrative remedies is not a prerequisite to suit under § 1983. Wells Fargo Armored Service

forestalling seizure of their bank. Having failed to appear, plaintiffs cannot now raise their claims in this Court.[13] Cf. Bd. of Public Instruction v. Finch, 414 F.2d 1068 (5th Cir. 1969).

Finally, plaintiffs contend that they were denied due process because the special assistant attorney general advising the Banking Board on legal matters maliciously "caused the Gregorys to be expelled from the banking business and then allowed the bank for which he was general counsel to purchase the assets belonging to plaintiff." [14] It is also claimed that the special assistant attorney general, as a stockholder and member of the board of directors of First Alabama Bancshares, the holding company that owned the bank which bought the Macon bank's assets, was motivated by a desire for financial gain. The simple answer to plaintiffs' contention is that the Board's attorney did not "expel" the Gregorys from the banking business; the decision to seize the bank in which the Gregorys owned stock was made by the State Banking Board. Moreover, the evidence supporting the Board's decision was so overwhelming that any influence the attorney may have had was inconsequential.[15]

Corp. v. Georgia Public Service Comm., 547 F.2d 938 (5th Cir. 1977) (citing general rule). Here, the available administrative remedy was not retrospective—i. e., a remedy designed to provide relief from a constitutional deprivation which had already occurred. Rather, the Banking Board hearing took place before the alleged deprivation; thus, it provided a means of preventing unconstitutional action. See Toney v. Reagan, 467 F.2d 953 (9th Cir. 1972), cert. denied, 409 U.S. 1130, 93 S.Ct. 951, 35 L.Ed.2d 263 (1973); Parker v. Letson, 380 F.Supp. 280 (N.D.Ga.1974).

14. Plaintiffs' Reply Brief (filed March 27, 1978) at 5.

15. The basis of plaintiffs' contention is that the attorney "encouraged the Banking Board to the point of insisting that the Bank be seized." Id., Defendants have submitted the transcript of the Board's hearing and the minutes of its closed-door meeting, which do not indicate that the attorney even expressed an opinion on whether the bank should be seized. The strongest statement he made was: "This bank has lost money consistently. You've seen the report of examination. I haven't seen many, but I don't think a bank text book could give a worse report than this." This statement, how-

### III. State Law Claims

■■ Plaintiffs aver that seizure of the bank failed to conform to the due process requirements of Alabama law. In addition, the Gregorys assert a claim for damages arising out of a lease agreement. Conceding that there is no independent ground for federal jurisdiction over these claims, plaintiffs suggest they are cognizable under the doctrine of pendent jurisdiction. The exercise of pendent jurisdiction, however, is discretionary. *Gibbs v. United Mine Workers,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). There is no valid reason for the exercise of pendent jurisdiction in this case. None of the federal claims have any merit, and at least one of the state claims involves a novel issue under the Alabama banking laws best left to the state courts. Accordingly, this Court declines to take pendent jurisdiction of plaintiffs' state law claims.

Since, from the above detailed analysis, it appears there is no merit to the claims asserted by plaintiffs against the FDIC and the United States, and there are no genuine issues of fact involved in this litigation as to the defendants First Alabama Bancshares, Inc., First Alabama Bank, N.A., Notasulga, Alabama, Federal Deposit Insurance Corporation, Dennis M. Mitchell, Herman Watson, A. M. Grimsley, Jr., Feagin Rainer, M. R. Crump, H. T. Strother, and Hayse McGahey, said defendants are entitled to judgment as a matter of law. An appropriate order and judgment will be entered.

## ON MOTION FOR RECONSIDERATION

This is an action brought pursuant to 42 U.S.C. § 1983 by plaintiffs First Bank of Macon County and its major stockholders, E. A. Gregory, Vonna Jo Gregory, Thomas

Brown, and John B. Coleman, who allege that their constitutional rights of due process and equal protection were violated when the Macon County Bank was closed and its assets sold by defendants Dennis M. Mitchell, Alabama Superintendent of Banks, and Federal Deposit Insurance Corporation. In addition, plaintiffs assert two claims under state law. Other defendants named in the complaint are the members of the State Banking Board; First Alabama Bancshares, Inc.; First Alabama Bank, N.A.; and the United States. In a memorandum and order entered on April 27, 1978, this Court granted motions to dismiss filed by F.D.I.C. and the United States. Further, it granted summary judgment in favor of the other defendants. The action is now submitted upon the motion filed by plaintiffs, requesting this Court to reconsider its order and judgment of April 27.

With respect to the contentions considered by this Court in its memorandum of April 27, the motion for reconsideration is denied. None of the matters presented by plaintiffs in their motion for reconsideration justify rescission of that memorandum. In their motion, however, plaintiffs request the Court "to allow them to proceed as derivative stockholders and to realign the Bank as a party Defendant." If plaintiffs' request, properly considered as a motion for leave to amend their complaint, is granted, this Court would have jurisdiction on the basis of diversity of citizenship to consider plaintiffs' state law claims, which the Court earlier refused to consider when the claims were merely pendent to those asserted under the Constitution. Yet, for the reasons set out in this memorandum opinion, plaintiffs' request for leave to amend their complaint is due to be denied.[1]

Plaintiffs' motion, as set out in their brief filed March 10, 1978, reads as follows:

If the above affidavits do not to the satisfaction of the Court demonstrate that there are genuine issues as to material facts in this cause and that the moving parties (Defendants) are not entitled to a judgment as a matter of law, then alternatively the Plaintiffs move the Court to permit them to supplement their affidavits by depositions, answers to interrogatories, or further affidavits as is allowed by Rule 56(e) or, should it appear to the Court from the affidavits attached hereto that the Plaintiffs cannot for

ever, certainly was no stronger than many others made during the hearing.

1. In their motion for reconsideration, plaintiffs raise another matter, stating:

The Plaintiffs respectfully remind the Court that in the Plaintiffs' Joint Alternative Memorandum in Opposition to the Motions to Dismiss filed on March 10, 1978, the Court was moved to permit Plaintiffs to supplement the affidavit by depositions and answers to interrogatories or further affidavits as allowed by Rule 56(e). The Court has not ruled on this motion.

■ The first reason for denying plaintiffs' motion for reconsideration is that it is untimely. Prior to the date on which summary judgment was granted in favor of defendants, plaintiffs invoked the jurisdiction of this Court solely on the basis of 28 U.S.C. § 1343 with respect to their federal constitutional claims and on the basis of pendent jurisdiction with respect to their state law claims. Plaintiffs first raised the possibility of bringing a shareholders derivative suit in their supplemental brief on the question of their standing to sue, filed several weeks after the various motions for summary judgment were submitted and several days after oral arguments were heard. In their brief, plaintiffs stated:

In the event this Court finds that the Plaintiff-Shareholders cannot maintain an individual action for deprivation of their personal liberties, they would ask leave to amend their complaint to file a Derivative Action by Shareholders under F.R.C.P. 23.1.

In the memorandum and order entered April 27, this Court treated plaintiffs' request as a motion to amend the complaint, denying the motion on the ground that even if plaintiffs were properly before the Court, they would not have been entitled to relief on their federal constitutional claims. Further, this Court exercised its discretion and declined to take pendent jurisdiction over the state law claims. At no time did plaintiffs assert their desire to bring the derivative action on the basis of diversity jurisdiction. In their motion for reconsideration, plaintiffs now assert that they should be allowed to amend their complaint to bring a stockholders derivative action so that this Court will have jurisdiction over the state law claims on the basis of diversity of citizenship. The simple answer to this contention is that the plaintiffs had ample opportunity to invoke this Court's diversity jurisdiction by bringing a derivative suit; by

failing to do so, they are barred from asserting their claim at this time. As the Fifth Circuit stated in *Freeman v. Continental Gin Company,* 381 F.2d 459, 469 (5th Cir. 1967):

A busy district court need not allow itself to be imposed upon by the presentation of theories seriatim. Liberality in amendment is important to assure a party a fair opportunity to present his claims and defenses, but "equal attention should be given to the proposition that there must be an end finally to a particular litigation."

. . . . .

[A] district court does not abuse its discretion in refusing to allow amendment of pleadings to change the theory of a case if the amendment is offered after summary judgment has been granted against the party, and no valid reason is shown for failure to present the new theory at an earlier time.

■ Even if plaintiffs' motion for leave to amend had been timely filed, it would still be denied since it affirmatively appears from the record that plaintiffs would be entitled to no relief under either of their state law claims. Plaintiffs' first claim based on state law is set out in Count VI of the complaint, which, enrolled in part, states:

[T]he Plaintiffs, E. A. and VONNA JO GREGORY, claim the accelerated amounts of a lease agreement executed between themselves and the Bank. The Plaintiffs Gregory are informed and believed, and upon such information and belief, aver that all the assets of the bank will be removed from its present location and relocated in a building of the FIRST ALABAMA BANK, N.A., Notasulga, Alabama. The accelerated amount of the

reasons stated present facts essential to justify their opposition, then, and in that event, the Plaintiffs move the Court to refuse the applications for summary judgment or to order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had in accordance with Rule 56(f), FRCP.

It must be emphasized that "alternative" motions of this sort are not cognizable in the Court. The decision whether to attempt to strengthen their case by submitting further evidence in its support is one to be made by each party and his attorneys.

lease is $421,200.00 and the Plaintiffs Gregory claim this amount . . ..

.    .    .    .    .

Even if this count properly states a cognizable claim or anticipatory breach, it raises no issues cognizable in this Court. The count appears to state a claim for breach of a lease agreement against the bank, and, presumably, against those defendants involved in the liquidation of the bank.[2] As such, plaintiffs' claim should be presented to the liquidator of the Macon Bank, not to this Court. The liquidation of a bank in Alabama is covered by Chapter 10 of Title 5 of the Alabama Code. Section 5–10–39 requires that all persons who have claims against the bank in liquidation file them with the Superintendent of Banks within a specified time. If the superintendent rejects the claim, he must notify the claimant, who may file an action seeking recognition of his claim in the court having jurisdiction of the affairs of the bank. *Id.* § 5–10–43; *see Jackson v. Whitesell,* 213 Ala. 369, 104 So. 662 (1925). There is no doubt that plaintiffs have a claim within the meaning of the statutory procedure. *See Jackson v. Whitesell, supra.* Accordingly, plaintiffs should file their claim with the Superintendent; if it is rejected, they will be able to bring an action in the appropriate state court. *See Ex parte Tennessee Valley Bank,* 231 Ala. 545, 166 So. 15 (1936). ("[T]he language of [Ala.Code § 5–10–43] signifies the legislative intent that all claims against [an] insolvent bank be adjudicated in the equity court having jurisdiction of the affairs of the bank, and, . . the whole purpose and scheme of the statute would exclude the conclusion that the process of liquidation should be delayed until claims against the assets of the bank in the hands of the receiver or trustee could be litigated in a different tribunal").

Plaintiffs' second claim under state law is that Ala.Code § 5–10–31 required that they be made parties to the action in the Circuit Court of Macon County, in which sale of the bank was approved.[3] Thus, they contend that, under the statutes, the sale is void because it was accomplished without notice and an opportunity to be heard. Plaintiffs' argument is based solely on the words of the statute. Apparently no Alabama court has considered such an argument. In their briefs, defendants did not extensively discuss the merits of plaintiffs' position, but rather simply argued that this Court should not exercise pendent jurisdiction over the claim. The limited discussion that is contained in their briefs, however, indicates that defendants believed no notice was required. Their argument is based on Ala.Code § 5–8–5 which, they assert, superseded Ala.Code § 5–10–31.[4] Defendants

2. It is hard to see how this count could state a claim against First Alabama Bancshares, Inc.; First Alabama Bank, N.A., and the members of the State Banking Board. The count does not state a claim against these defendants on the ground that they tortiously interfered with a lease agreement.

3. Ala.Code § 5–10–31 provides:
The superintendent, by making application to the circuit court of the county in which the bank is located, may procure an order to sell or compound all bad or doubtful debts and on like order may sell all real and personal property of such corporation or individual banker on such terms as the court shall direct; provided, however, that the superintendent shall have the right to ask for a blanket order from the circuit court of the county wherein the bank is located for the settlement of all debts, claims of any and all nature, and deposits and for the sale of real and personal property wherein the amount or amounts involved are of less value than $2,500.00, but on all or any of such court proceedings, the bank or individual banker shall be made a party by prop-

er service of process issued from the court, and the hearing of any such application or petition of the superintendent may be had at any time after the bank or individual banker has had five days' notice of the application, provided, however, if notice of the hearing of said application is waived or the allegation of said application is admitted by the bank or individual banker, no further proof will be required of the allegations of said application and the order may be forthwith granted by the court hearing said application.

4. Ala.Code § 5–8–5 provides:
With respect to any banking institution which is now or may hereafter be closed on account of inability to meet the demands of its depositors or by action of the state superintendent of banks or of a court or by action of its directors or in the event of its insolvency or suspension, the state superintendent of banks or the receiver or liquidator of such institution with the permission of said state superintendent of banks may borrow from the federal deposit insurance corporation and

further assert that § 5–10–31 involves the sale of doubtful or bad assets and not a purchase and assumption transaction such as the one involved here.

Plaintiff's argument has very little, if any, merit. Section 5–10–31 is part of the chapter governing liquidation of banks; the various Sections of the chapter set out the procedures to be followed upon such a liquidation. While Section 5–8–3, which authorizes the FDIC to act as a receiver or liquidator of a bank, subjects the FDIC to all of the duties imposed on a bank receiver or liquidator by state law, Section 5–8–5 appears to supersede section 5–10–31.

Several arguments support the notion that Section 5–10–31 did not entitle plaintiffs to notice prior to the sale of the bank. First, Section 5–10–31 can be read as requiring notice only when the superintendent of banks asks for a "blanket order" from a Circuit Court authorizing him to settle all debts and claims or sell real or personal property where the amounts involved are less than $2,500. Such a reading is possible if the notice clause only refers to the clause immediately preceding it, a reasonable assumption given the fact that it is separated from the clause authorizing the superintendent to secure an order to sell all real and personal property to the bank. Second, the Circuit Court of Macon County which approved the sale of the bank's assets did not consider notice to the plaintiffs necessary.[5] Although the decision of the state trial court is not controlling on the issue of whether notice is required by state law, *see Backar v. Western States Producing Co.*, 547 F.2d 876, 882 (5th Cir. 1977) ("[The Fifth Circuit is] no more bound by the decisions of these New York trial courts than the New York Court of Appeals would be . . . ."), it is entitled to some weight. *See Commissioner v. Estate of Bosch*, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). Moreover, if Section 5–10–31 is subject to conflicting construction and thus fails to provide a clear mandate, a good case can be made that the same policies which permit a bank to be summarily seized without violating the United States Constitution, *see Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Fahey v. Mallonee*, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed.2d 30 (1947), should permit such a seizure without violating state law.

An order will be entered denying plaintiffs' motion for reconsideration.

---

5. In its order approving the FDIC's petition for approval of the proposed sale of assets, the court stated:

This Court, after considering the verified petition, is also of the opinion and finds that immediate consideration by the Court of the verified petition is urgently needed to avoid adverse consequences to depositors, creditors, and stockholders of the Bank and to the public, that pursuant to law, an order may be entered in connection with the verified petition without notice and that for the reasons set forth in the verified petition it is in the best interest of the depositors, creditors, and stockholders of the Bank and the public that an order authorizing and approving the transaction set forth in the verified petition be entered immediately without notice.

furnish any part or all of the assets of said institution to said corporation as security for a loan from same; provided, that where said corporation is acting as such receiver or liquidator, the order of a court of record of competent jurisdiction shall be first obtained approving such loan. The state superintendent of banks, upon the order of a court of record of competent jurisdiction and, upon a like order and with the permission of said state superintendent of banks, the receiver or liquidator *of any such institution may sell to* said corporation any part or all of the assets of such institution. The provisions of this section shall not be construed to limit the power of any banking institution, the state superintendent of banks or receivers or liquidators to pledge or sell assets in accordance with any existing law.