[No. B003211. Second Dist., Div. Three. Apr. 24, 1985.]

In re BANK OF SAN MARINO in Liquidation.
FEDERAL DEPOSIT INSURANCE CORPORATION,
Plaintiff and Respondent, v.
BANK OF SAN MARINO, Defendant and Appellant.

**COUNSEL**

Michael Norman Saleman and Harold B. Green for Defendant and Appellant.

Schall, Boudreau & Gore, Gibson E. Pratt, Joyce J. Burrows, Thomas A. Brooks and Kenneth J. Marino for Plaintiff and Respondent.

John K. Van de Kamp, Attorney General, Edmond B. Mamer, Randall P. Borcherding and Raymond B. Jue, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiff and Respondent.

## Opinion

LUI, J.—

### Summary

In the late afternoon of April 8, 1983, a petition was filed by the respondent Federal Deposit Insurance Corporation (FDIC) seeking to have the superior court approve the sale of certain assets and the transfer of certain liabilities of the appellant Bank of San Marino (Bank) to Trans American National Bank (Trans American). The court directed that the FDIC give telephonic notice to the president of the Bank and its counsel, after 6 p.m., that a hearing would be convened on the petition at 8 p.m.

Following the hearing which began at 8:20 p.m. in which the Bank was not represented, the superior court entered an order approving the sale of certain assets and the transfer of certain liabilities of the Bank to Trans American. ■ The Bank filed a timely appeal from said order.[1] We affirm.

### Facts and Procedural History

On and prior to April 8, 1983, the Bank was a state-chartered banking corporation regulated by the Superintendent of Banks for the State of California. Its principal place of business was in Los Angeles.

On the evening of Friday, April 8, 1983, at 6:03 p.m., Acting Superin-

---

[1]This order is final and appealable as a final determination in a special proceeding. (See *In re Bank of San Pedro* (1934) 1 Cal.2d 675, 680 [37 P.2d 80]; and *Knoll* v. *Davidson* (1974) 12 Cal.3d 335, 343 [116 Cal.Rptr. 97, 525 P.2d 1273].)

tendent Harold D. Doyle (Superintendent), proceeding pursuant to California Financial Code section 3100 et seq.,[2] closed the Bank and took possession of its property and business. The Superintendent ordered the Bank liquidated;[3] such action was necessary in order to proceed with the sale of the Bank's assets and deposits to another bank.

Pursuant to section 3221, the Superintendent tendered the appointment of receiver for the Bank to the FDIC. Pursuant to 12 United States Code section 1821(e), the FDIC was required to accept the appointment and accordingly took possession of the Bank's property, assets and affairs. Thereafter, the FDIC reviewed the bids that it had received at a bid meeting held on April 6, 1983, which was attended by 18 banks (50 had been invited to attend) interested in purchasing a portion of the Bank's assets and assuming certain of the Bank's liabilities.

Trans American submitted the highest bid of the three bids that were received, and the FDIC accepted it. The FDIC then entered into three agreements with Trans American: a purchase and assumption agreement, a contract of sale, and an indemnity agreement.[4] These three agreements collec-

---

[2]Hereinafter, all references shall be to the Financial Code unless otherwise indicated.
Section 3100 provides: "Whenever it appears to the superintendent that:
"(a) The contributed capital of any bank is impaired;
"(b) Any bank has violated its articles or any law of this state;
"(c) Any bank is conducting its business in an unsafe or unauthorized manner;
"(d) Any bank refuses to submit its books, papers, and affairs to the inspection of any examiner;
"(e) Any officer of any bank refuses to be examined upon oath touching the concerns of such bank;
"(f) Any bank has suspended payment of its obligations;
"(g) Any bank is in such condition that it is unsound, unsafe, or inexpedient for it to transact business; or
"(h) Any bank neglects or refuses to observe any order of the superintendent made pursuant to Section 1913 unless the enforcement of such order is restrained in a proceeding brought by the bank; the superintendent may forthwith take possession of the property and business of such bank and retain possession until such bank resumes business or its affairs be finally liquidated as herein provided. Such bank, with the consent of the superintendent, may resume business upon such conditions as he may prescribe. The term 'bank' wherever used in this chapter includes trust companies."

[3]The Bank is challenging the Superintendent's closure of the bank and takeover of its assets and assumption of its liabilities in a separate action pending below (Bank of San Marino v. Louis Carter, et al., Los Angeles Superior Court Case No. C449870). That action is not directly involved in this appeal.

[4]The terms of these agreements essentially provided that Trans American was assigned certain assets of approximately $4,688,000 and assumed deposit liabilities of approximately $12,278,000, or a difference of $7.59 million. The FDIC provided cash of $7,294,000. The difference between these latter two sums represented the premium which Trans American paid for the Bank's going concern value and was approximately the $288,000 premium recited in these agreements. Those assets not acquired by Trans American were purchased by the FDIC in its corporate capacity (as contrasted with its capacity as receiver or insurer of banks).

tively constituted a purchase and assumption transaction, and were executed within one or two hours after the Bank was closed.[5]

Immediately after these agreements were executed, the Superintendent approved the sale of the Bank's business and assets subject to court approval as provided in section 3110.1.[6]

The FDIC had filed an ex parte petition in the trial court earlier that day seeking an order approving the sale to Trans American. The court had instructed the FDIC to give telephonic notice of the hearing scheduled for that evening by contacting the Bank and its lawyers[7] as provided in section 3131.[8]

---

[5] The FDIC is empowered to arrange a purchase and assumption agreement by 12 United States Code section 1823. The Superintendent is similarly empowered, subject to court approval, by section 3110.1.

[6] Section 3110.1 provides in pertinent part as follows: "(a) *The superintendent may, with the approval of the court and of the superintendent, sell any part or the whole of the business of the bank to any other bank.* Such purchase and sale shall be approved by the purchasing bank, as follows:

"... . . . . . . . . . . . . . . . . . . . . .

"(d) *When a purchase and sale of the type described in subdivision (a) or (b) becomes effective* or, in case the receiver of a national banking association sells the whole or any part of the business of such national banking association to another national banking association, when such purchase and sale becomes effective, *the purchasing bank shall, ipso facto and by operation of law and without further transfer, substitution, act, or deed,* to the extent provided in the agreement of the purchase and sale or in the order of the court approving the purchase and sale and except as withheld or limited by such agreement or by such order:

"(1) *Succeed to the rights, obligations, properties, assets, investments, deposits, demands, and agreements of the bank whose business is sold,* subject to the right of every depositor of such bank whose deposit is sold to withdraw his deposit in full on demand after such sale, irrespective of the terms under which the deposit was made;

"(2) Succeed to the rights, obligations, properties, assets, investments, deposits, demands, and agreements of the bank whose business is sold under all trusts, executorships, administrations, guardianships, conservatorships, agencies, and other fiduciary or representative capacities, to the same extent as though the purchasing bank had originally assumed, acquired, or owned the same, subject to the rights of trustors and beneficiaries under the trusts so sold to nominate another or succeeding trustee of the trust so sold after the sale; and

"(3) Succeed to and be entitled to take and execute the appointment to executorships, trusteeships, guardianships, conservatorships, and other fiduciary and representative capacities to which the bank whose business is sold is or may be named in wills, whenever probated, or to which it is or may be named or appointed by any other instrument.

"(e) *For purposes of subdivision (d), any purchase and sale of the type referred to in subdivision (d) shall be deemed to be effective at such time as is provided in the agreement of such purchase and sale or in the order of the court approving the purchase and sale.*" (Italics added.)

[7] The record of the hearing reveals the following facts which appellant does not contest: Kenneth Marino, an attorney for the FDIC, made successive phone calls, from approximately 6:10 to 6:15 p.m. on April 8, 1983, to two attorneys for the Bank in San Francisco (Fn. 7 continued on next page.)

[8] Section 3131 states: "Whenever pursuant to the provisions of this chapter the approval of the court is required of any step in the liquidation proceedings such approval shall be (Fn. 8 continued on next page.)

The hearing commenced at 8:20 p.m. with counsel for the FDIC, the Superintendent, and Trans American in attendance. The Bank did not appear at the hearing.

The grounds for closure and takeover by the Superintendent are not the direct subject of this appeal. However, the findings of the Superintendent are relevant to determine whether there was a prima facie showing necessitating closure and takeover of the Bank and whether the speed in which the FDIC and the Superintendent proceeded was justified under the circumstances or whether, as the Bank urges, the procedures violated its rights to due process.

During the course of the hearing, the court was presented with a document entitled "Order Taking Possession of Property" (exhibit 1) which contained the Superintendent's findings concerning the Bank. Attached thereto is a document which purports to be the Bank's own daily financial statement as of March 31, 1983, reflecting, in summary, the following:

| | |
|---|---|
| Assets | $13,176,190.53 |
| Liabilities | $13,095,937.88 |
| Stockholder's Equity | |
| Capital Stock | $ 1,980,595.75 |
| Retained Earnings (Deficit) | ( 1,900,343.10) |
| | 80,252.65 |
| Liabilities & Equity | $13,176,190.53 |

Based on this financial information, the Superintendent found that the Bank's capital was "impaired" within the meaning of section 134, subdivision (b), because the deficit exceeded 40 percent of the contributed capital. Section 3100, subdivision (a), authorizes the Superintendent to take possession of any bank if such bank's capital is impaired.

---

(Fn. 7 continued.)

and to Duane Hoyt, president of the Bank, and informed them that the hearing had been scheduled for that evening contingent on the acceptance of the Trans American bid by the board of trustees of the FDIC. He reached Mr. Hoyt at the Bank's offices. Mr. Marino limited his communications to the notice of hearing and the events; he did not discuss the feasibility of the Bank or its legal counsel appearing at the hearing.

Later, Gibson Pratt, another attorney for the FDIC, telephoned the same parties and informed them individually that: (a) the bid had been accepted by FDIC, (b) the hearing would take place, and (c) he would be telephoning the same three parties named above with this information.

One attorney for the Bank and Mr. Hoyt individually informed Mr. Pratt that they did not believe that anyone would be present at the hearing to represent the Bank.

(Fn. 8 continued.)

given after a hearing had *upon such notice as the court may direct*. At any such hearing the court may by order approve the actions of the superintendent for which he has petitioned the court's approval or it may, by appropriate order, otherwise direct the superintendent in the matter in connection with which the petition was filed." (Italics added.)

The Superintendent also found that the Bank had violated sections 776 and 3354 by operating a real estate loan department and entering into leases with Stephen C. Forde, a controlling person as defined in section 700, without obtaining the Superintendent's approval. The Superintendent also found that the Bank was conducting its business in an unsafe manner and that its condition was "unsound, unsafe and inexpedient for it to transact business."

At the conclusion of the hearing, the court issued the challenged order approving the purchase and assumption agreement between FDIC and Trans American.

On April 18, 1983, 10 days after the court hearing, the Bank filed an application pursuant to section 3101[9] for an order enjoining further proceedings pending a judicial determination of the validity of the Superintendent's seizure. As indicated *ante* in footnote 3, this action is pending in the court below.

The Bank's appeal concerns the April 8, 1983, order approving the sale of assets and transfer of liabilities to Trans American pursuant to section 3110.1.

CONTENTIONS ON APPEAL

The Bank contends on appeal that:

1. The FDIC's petition for an order approving the sale of the assets and the transfer of liabilities to Trans American was insufficient as a matter of law to support the order requested; and

2. Section 3101 provides an automatic 10-day stay and the trial court's failure to stay its order for this period denied the Bank due process of law.

DISCUSSION

I

*The Petition Presented a Prima Facie Showing Under Section 3100 and Was Sufficient to Support the Order*

The Bank's contention that the petition is insufficient as a matter of law lacks merit. The Bank fails to support this contention with any showing

---

[9]Section 3101 states: "*Whenever the superintendent has taken possession of the property and business of any bank, such bank, within 10 days after such taking, if it deems itself aggrieved thereby, may apply to the superior court in the county in which the head office of such bank is located to enjoin further proceedings.* The court, after citing the superintendent to show cause why further proceedings should not be enjoined and after a hearing and a determination of the facts upon the merits may dismiss such application or enjoin the superintendent from further proceedings and direct him to surrender the property and business to such bank." (Italics added.)

other than to claim that the lack of any adversary hearing prevented "the court from ascertaining or discovering omissions and flaws in the petition" or to allow the court to explore alternative procedures which the FDIC could have utilized other than to close and sell its business to Trans American.

There is no showing in the Bank's briefs that demonstrates any omission, flaw or viable alternative available to the FDIC. Rather, as indicated above, the Bank's own financial statement reflects that its capital was impaired within the meaning of section 134, subdivision (b). Under section 3100, the Superintendent was empowered to take possession of the Bank's property and business and to liquidate the Bank. The fact that the FDIC had to contribute cash in the amount of $7,294,000 to meet the difference between the assets transferred and deposit liabilities assumed by Trans American demonstrates the grave financial condition of the Bank at the time it was closed.

II

*The Bank's Due Process Claims*

A. *The Bank Was Given Adequate Notice of the Hearing Pursuant to Section 3131*

Section 3131, *ante* at footnote 8, provides for the giving of "such notice as the court may direct" whenever the approval of the court is required in any step of the liquidation procedure. This section is applicable to purchase and sale transactions consummated subject to court approval under section 3110.1.

The Bank concedes that it received the notice indicated but contends that the two-hour notice it received was insufficient because it did not afford it a reasonable opportunity to appear.

Appellate decisions have authorized the closure and seizure of a bank upon an ex parte application to the court. In *Fuentes* v. *Shevin* (1972) 407 U.S. 67 [32 L.Ed.2d 556, 92 S.Ct. 1983], the United States Supreme Court struck down replevin laws of Florida and Pennsylvania which authorized summary seizure of goods and chattels based on an ex parte application. The court found those statutes violated the due process clause of the federal Constitution even though the chattels and goods could be regained in a postseizure hearing. However, the court recognized that there were valid exceptions which would justify an ex parte application seizing the assets. The court stated at 407 U.S., pages 90-92 [32 L.Ed.2d, pages 576-577], "[o]nly in a few limited situations has this Court allowed outright seizure [fn. omitted] without opportunity for a prior hearing. First, in each case,

the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance. *Thus, the Court has allowed summary seizure* of property to collect the internal revenue of the United States, [fn. omitted] to meet the needs of a national war effort, [fn. omitted] *to protect against the economic disaster of a bank failure,* [fn. omitted; citing *Fahey* v. *Mallonee* (1947) 332 U.S. 245 (91 L.Ed. 2030, 67 S.Ct. 1552)] and to protect the public from misbranded drugs [fn. omitted] and contaminated food. [Fn. omitted.]" (Italics added.)

In *Fahey* v. *Mallonee, supra,* 332 U.S. at pages 253-254 [91 L.Ed. at page 2039], the court upheld regulations of the federal savings and loan system which empowered its administrator (the Federal Home Loan Bank Administration) to seize and transfer to the Federal Savings and Loan Insurance Corporation (the FDIC's counterpart) the property of any federal savings and loan association which the administrator believed to be operating unsafely or with impaired assets. The court stated, "[i]t is complained that these regulations provide for hearing after the conservator takes possession instead of before. This is a drastic procedure. But the delicate nature of the institution and the impossibility of preserving credit during an investigation has made it an almost invariable custom to apply supervisory authority in this summary manner. It is a heavy responsibility to be exercised with disinterestedness and restraint, but in the light of the history and customs of banking we cannot say it is unconstitutional. [Fn. omitted.]"

California courts have similarly upheld against due process challenges the seizure and transfer of the assets of a bank under the criteria set forth in former section 136 of the Banking Act which is now embodied in section 3100. (See *State Savings etc. Bank* v. *Anderson* (1913) 165 Cal. 437, 446-449 [132 P. 755]; *Bank of Italy* v. *Johnson* (1926) 200 Cal. 1, 12 [251 P. 784]. See also *Holabird* v. *Richardson* (1935) 3 Cal.2d 299, 302-303 [44 P.2d 530], for the same proposition concerning building and loan associations.)

In *Randone* v. *Appellate Department* (1971) 5 Cal.3d 536, 553 [96 Cal.Rptr. 709, 488 P.2d 13], the Supreme Court had occasion to review the constitutionality of a prejudgment attachment statute and stated in persuasive dicta that "[a]lthough the kind of 'extraordinary situation' that may justify summary deprivation cannot be precisely defined, three decisions . . . cited . . . in *Sniadach* [v. *Family Finance Corp.* (1969) 395 U.S. 337

(23 L.Ed.2d 349, 89 S.Ct. 1820)] give some indication of the type of countervailing interests that have been found sufficient in past cases. Both *Fahey* v. *Mallonee* . . . and *Coffin Bros.* v. *Bennett* (1928) 277 U.S. 29 . . . entailed the validity of summary procedures permitting specialized governmental officers to react immediately to serious financial difficulties of a banking institution by seizing operational control of the bank's assets. [Fn. omitted.] Given this nation's considerable experience with the public danger that can flow directly and precipitously from bank failures, [fn. omitted] and the closely regulated nature of the banking industry, the court determined in both cases that the challenged procedures were sufficiently focused to meet an exceptional problem and thus that the procedures were constitutional."

Federal decisions have approved a proposed sale of certain insolvent bank's assets without any formal notice to the bank of either the filing of a petition or the hearing. (See *Federal Deposit Ins. Corp.* v. *American Bank* (4th Cir. 1980) 629 F.2d 951; *Matter of Liquidation of American City B. & T. Co., N.A.* (E.D.Wis. 1975) 402 F.Supp. 1229; and *In re Franklin National Bank* (E.D.N.Y. 1974) 381 F.Supp. 1390.)

However, since actual notice of the petition and the hearing to approve the proposed sale was given to the Bank and its counsel, we need not decide whether the court may dispense with any notice of proceedings seeking court approval of a purchase and assumption transaction under section 3110.1.

B. *Because the Bank Chose Not to Appear or to Request a Continuance, It Cannot Claim It Was Denied a Hearing*

The Bank's claim of violation of its due process is premised on the lack of any opportunity to appear at the hearing due to the inadequacy of the notice it was given.

At first blush, the Bank's contention seems to have merit because it was unlikely to expect its counsel in San Francisco to be able to appear at a hearing in Los Angeles less than two hours after receiving telephonic notice. However, the Bank's contention evaporates once we consider the following facts: (1) the Bank's president was contacted at the Bank's offices in Los Angeles and indicated that it would not appear at the hearing; (2) the Bank's attorneys in San Francisco were contacted and responded that they did not believe that the Bank would be represented at the hearing; the two attorneys contacted in San Francisco were members of large law firms with offices in Los Angeles; (3) neither the Bank nor its counsel requested a delay to afford the Bank an opportunity to appear and to present opposition to the petition;

(4) neither the Bank nor its counsel requested an opportunity to appear telephonically should the court refuse to delay the hearing. Considering these facts, we are not persuaded that the Bank's due process rights were violated.

Given the drastic circumstances presented in the notices to the Bank, a responsible person or counsel with meritorious opposition to such a petition would have presented it in some manner either in person or telephonically if the court refused to delay the proceedings. In view of the lack of any opposition or request to appear or continue the hearing, the trial court did not abuse its discretion in proceeding with the hearing as scheduled and to approve the sale under section 3110.1 once a prima facie showing under section 3100 was made.

### III

*Section 3101 Does Not Provide an Automatic 10-day Stay. It Merely Provides a Statute of Limitations of 10 Days in Which the Bank May File an Application to Enjoin the Superintendent's Further Proceedings*

The Bank contends that the language contained in section 3101 (*ante,* fn. 9) provides for a 10-day automatic stay of any proceeding and that the court's approval of the purchase and assumption agreement between FDIC and Trans American, which was to take effect immediately upon court approval, violated this automatic stay provision. We disagree.

The Bank relies on *State Savings etc. Bank* v. *Anderson* (1913) 165 Cal. 437 [132 P. 755]; *Evans* v. *Superior Court* (1942) 20 Cal.2d 186 [124 P.2d 820]; and *Trede* v. *Superior Court* (1943) 21 Cal.2d 630 [134 P.2d 745].[10] In *State Savings, supra,* 165 Cal. 437, the court had occasion to review the provisions of former section 136 of the Banking Act (Stats. 1909, p. 115) setting forth essentially the same language as the present section 3101 which allows an aggrieved bank to petition the superior court for an order enjoining the superintendent from further proceedings within 10 days after closure and takeover. The court in *State Savings* characterized section 136 as being a statute of limitations. Recently, in *Dominguez* v. *Superior Court* (1983) 139 Cal.App.3d 692, 695 [189 Cal.Rptr. 5], the Court of Appeal had occasion to review section 3101 and also characterized the 10-day provision as being a statute of limitations.

---

[10]The Bank also relies on *Porter* v. *Investors Syndicate* (1932) 286 U.S. 461 [76 L.Ed. 1226, 52 S.Ct. 617]. However, that decision is distinguishable; it deals only with the interpretation of certain provisions of the Montana corporate securities laws and there is no relation to a bank liquidation.

In discussing this 10-day period, the court in *State Savings, supra,* 165 Cal. at pages 447-448 stated, "[t]he initial taking authorized by the Bank Act is not intended to work a permanent divestment of the title of the bank to its property. The provision merely authorizes the superintendent to take temporary statutory custody of it. The power conferred on him is for the purpose of preserving the property for administration under the Banking Act. He takes and holds it as a statutory custodian for that purpose until either the bank brings an action to test the validity of his finding of its insecurity or unsoundness and under which he justifies the taking, or through a failure to do within the time limited for that purpose the bank admits that his action in making the seizure was warranted and thereby consents to the liquidation of its affairs, or until in a suit brought by the bank the court enjoins further proceedings on the part of the superintendent and directs a restitution of the business and property of the bank. While the initial seizure is authorized under the act without suit brought and is justified as a matter of public policy for the reasons here given, it cannot be said that the bank is thereby deprived of its property without due process of law as heretofore defined. An opportunity is given the alleged delinquent bank to invoke the aid of a court of competent jurisdiction as to the validity of the seizure and right of the superintendent to hold the property, and if that opportunity is a reasonable one, then the right which the constitution guarantees has been in substance preserved to it."

The Bank relies on the above language in *State Savings* characterizing the Superintendent as being "statutory" custodian for temporary custody of the Bank's assets as indicating that any order of closure and possession is automatically stayed and in abeyance for a period of 10 days. While the language in *State Savings* construing section 136 is susceptible to that interpretation, section 136 of the Banking Act and section 3101 predate the enactment of section 3110.1. (Stats. 1974, ch. 855, § 1, p. 1820.)

As originally enacted in 1974, section 3110.1 permits the Superintendent, subject to court approval, to sell any part or all of the bank and to fix the time when the sale shall be effective. In section 3223, enacted in 1951 (Stats. 1951, ch. 364, § 3223, p. 957), the FDIC as receiver is possessed with all powers, rights and privileges given to the Superintendent except as may be in conflict with the provisions of the Federal Deposit Insurance Act as amended (12 U.S.C. § 1811 et seq.).

Commencing in 1974, the Legislature empowered the Superintendent or the FDIC (acting as a receiver) to enter into a purchase and assumption agreement and to specify the effective date of the agreement subject to court approval.

Therefore, when *State Savings, Evans,* and *Trede* were decided, none of the legislative provisions that now authorize an immediate purchase and assumption of the assets and liabilities of a closed bank were in existence.

In *F.D.I.C.* v. *Merchants Nat. Bank of Mobile* (11th Cir. 1984) 725 F.2d 634, the Court of Appeals of the Eleventh Circuit had occasion to review the options available to the FDIC when an insured bank fails and there is a necessity for immediate action. "When an insured bank fails, FDIC can make direct deposit insurance payoffs on insured deposits. The bank remains permanently closed, and all insured accounts are paid off to the insured limit. The direct payoff alternative is not the preferred one:

" 'The undesirability of the deposit insurance payoff alternative is readily apparent. A bank failure and a subsequent payoff of insured deposits results in an interruption of vital banking services to the community which the failed bank served. The failed bank's main office and any branches which it operated are permanently closed. As a consequence, virtually all of the failed bank's employees are without jobs. All time, demand and saving deposit accounts of the failed bank are frozen and any checks in transit at the time the bank closed are returned unpaid to the drawer. . . .' (Burgee, *Purchase and Assumption Transactions Under the Federal Deposit Insurance Act,* 14 The Forum 1146, 1153 (1979) (senior counsel in office of general counsel of FDIC explains FDIC's options).)

"On the other hand, FDIC can undertake a purchase and assumption transaction when the insured bank fails. FDIC as receiver of the failed bank sells acceptable assets of the failed bank to another financially sound and insured bank (the assuming bank). In return the assuming bank assumes all the failed bank's deposit liabilities. FDIC as receiver obtains full value for the acceptable assets as well as a premium from the assuming bank for the 'going concern' value of the failed bank. The value of the assets purchased by an assuming bank plus the premium it pays is always less than the amount of liabilities (such as deposits) that it assumes. To generate cash that can be transferred to the assuming bank to balance the value of the assets and liabilities it assumes, FDIC as receiver contracts with FDIC in its corporate capacity to purchase the assets that are unacceptable to the assuming bank. . . . Thus FDIC in its corporate capacity pays FDIC as receiver an amount equal to the cash difference between the value of the assets purchased and liabilities assumed by the assuming bank, less the amount of the premium paid by the assuming bank. *See generally Burgee, supra,* at 1154-55.

"The purchase and assumption transaction has several advantages for FDIC and the public:

" 'The Purchase and Assumption transaction avoids the numerous adverse results of the deposit insurance payout method. Virtually all of the failed bank's depositors and other creditors are fully protected by the assumption of their deposits and debts by the assuming bank. The FDIC as insurer of deposits is relieved from the difficult and time consuming obligation of paying off hundreds or even thousands of depositors. Of utmost significance is the fact that the banking services to the citizens of the community previously served by the failed bank continue uninterrupted as the assuming bank agrees to reopen all of the failed bank's offices on the next business day. Of particular significance is the fact that the receiver obtains the benefit of a premium, which is often substantial, for the going concern value of the failed bank that would be lost in the event of a deposit payoff.' (*Id.* at 1156.)" (*F.D.I.C.* v. *Merchants Nat. Bank of Mobile, supra,* 725 F.2d at pp. 637-638.)

There are no reported appellate decisions which have construed section 3101 as providing an automatic 10-day period in which the Superintendent's powers are stayed. In our view, the plain language of this section negates such a construction. Rather, as in *State Savings, supra,* 165 Cal. 437, and the recent decision of *Dominguez* v. *Superior Court, supra,* 139 Cal.App.3d 692, the 10-day provision constitutes a statute of limitations period in which a bank must file an action.

In addition, section 3101 must be read in connection with section 3110.1 in determining whether there is any conflict between these two sections since section 3110.1 may be construed as empowering the Superintendent or the FDIC to undertake an immediate sale of a failed bank's assets upon closure.

█ "The fundamental rule of statutory construction is that the court should ascertain the legislative intent so as to effectuate the purpose of the law. To this end, every statute should be construed with reference to the whole system of law of which it is a part, so that all may be harmonized and have effect. [Citation.]" (*Moore* v. *Panish* (1982) 32 Cal.3d 535, 541 [186 Cal.Rptr. 475, 652 P.2d 32].)

"Where a statute is theoretically capable of more than one construction we choose that which most comports with the intent of the Legislature. [Citations.] Words must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent possible. [Citations.]" *California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].

█ In our view, section 3101 must be interpreted in the historical context in which the Financial Code has been modified by the Legislature

through the years. Since the original enactment of section 136 of the Banking Act in 1909 (now embodied in § 3101), the Legislature has periodically amended the Financial Code to conform with federal statutes and the implementation of the Federal Deposit Insurance Corporation. Recognizing the need to take immediate action in the event of a bank failure, the Legislature, in 1974, enacted section 3110.1 which permits the immediate sale of a bank upon closure even though section 3101 would permit the aggrieved bank to petition the superior court for relief and to enjoin further proceedings by the Superintendent. In reviewing the legislative history of these sections, we conclude that section 3110.1 authorizes the immediate consummation of a purchase and assumption agreement even though a bank may not have the full 10-day period in which to seek injunctive relief under section 3101.

In the instant case, the Bank and its counsel were advised that the Bank was closed and that a purchase and assumption agreement had been consummated subject to court approval. The Bank was notified but chose not to appear or to seek an opportunity to address the court. The Bank was apparently relying on an erroneous interpretation of section 3101, namely, that it would have 10 days to challenge both the closure and the sale and to hold up the liquidation process for that period of time. As a matter of public policy, we cannot agree with such a strained construction of section 3101 in view of the language contained in section 3110.1.

### Disposition

The order is affirmed.

Klein, P. J., and Danielson, J., concurred.