**Kent L. BROWN and Larry R. Hendricks, Plaintiffs and Appellants,**

v.

**Elaine B. WEIS and The Department of Financial Institutions of Utah, Defendants and Appellees.**

No. 920703–CA.

Court of Appeals of Utah.

March 11, 1994.

---

554

Arthur H. Nielsen, Richard M. Hymas, and John K. Mangum, Salt Lake City, for plaintiffs and appellants.

Ray R. Christensen, Jay E. Jensen, Elwood P. Powell, Denton M. Hatch, Salt Lake City, for defendants and appellees.

Before BENCH, JACKSON and ORME, JJ.

## OPINION

ORME, Associate Presiding Judge:

Plaintiffs, the former owners of a defunct thrift institution, appeal the trial court's grant of summary judgment dismissing their action seeking damages for breach of contract, constitutional violations, and deprivation of federal civil rights.[1] We affirm in part and reverse in part.

## FACTS [2]

In late 1984, the Department of Financial Institutions of Utah (the Department) determined that Western Heritage Thrift and Loan Company (Western Heritage), a Utah chartered industrial loan corporation, was a "failing depository institution" within the meaning of Utah Code Ann. § 7–19–1(1) (Supp.1994). In order to avoid closure and liquidation, the Department sought to arrange a merger or acquisition between the then-current owners of Western Heritage and some other party that could offer a better prospect of continuing Western Heritage's business.

In November of 1984, an officer of Western Heritage contacted plaintiffs and advised them of the situation regarding Western Heritage. Brown, a leasing expert, and Hendricks, a certified public accountant,[3] subsequently began exploring the possibility of purchasing Western Heritage. Plaintiffs later met and negotiated with Elaine B. Weis, who at the time was Commissioner of the Department, and other department officials, regarding the purchase of Western Heritage.

---

1. The appeal is nominally from a judgment of no cause of action, dated July 26, 1991. That judgment is based on a memorandum decision and order, dated June 5, 1991, granting defendants' motion for summary judgment.

2. When reviewing a summary judgment, the facts and inferences to be drawn therefrom are stated in the light most favorable to the nonmoving party. *Ledfors v. Emery County Sch. Dist.*, 849 P.2d 1162, 1162 (Utah 1993). However, as discussed *infra*, this appeal is more akin to review of an order of dismissal for failure to state a claim, which requires the court to construe the complaint in the light most favorable to the plaintiff and indulge all reasonable inferences in plaintiff's favor. *Mounteer v. Utah Power & Light Co.*, 823 P.2d 1055, 1058 (Utah 1991). We recite the facts accordingly, but note that on remand they should not be taken as established for purposes of subsequent proceedings, either under the "law of the case" doctrine or on any other basis.

3. The trial court characterized the plaintiffs as "sophisticated businessmen" and neither party has objected to that description.

During the course of negotiating with defendants, plaintiffs learned that any offer they intended to make needed to include a month-by-month projection, or pro forma, of Western Heritage's financial picture. Plaintiffs understood that unless they could show that they would be able to reverse Western Heritage's loss of approximately $30,000 per month, and begin making a profit within three years, the Department would not allow them to acquire the stock of Western Heritage.

The verified complaint indicates that Hendricks first constructed the pro forma on November 14, 1984, at the offices of the accounting firm KMG Main Hurdman. KMG Main Hurdman made its employees, computers, and software available to Hendricks, and Hendricks based his pro forma on representations made by James Munsee, an officer of Western Heritage. Munsee had provided Hendricks with a loan delinquency report, a provisional balance sheet and income statement, and a preliminary audit performed by KMG Main Hurdman. Hendricks revised this pro forma several times. The final pro forma, submitted to the Department in December of 1984, projected that even after the injection of new capital of $550,000 from plaintiffs, Western Heritage would continue to lose money until December of 1986. Plaintiffs' pro forma also indicated, according to plaintiffs' affidavit, that through the first two years of operation, Western Heritage would lose over $380,000 of the new capital plaintiffs proposed to contribute. It also projected that Western Heritage would make a profit of over $180,000 in the third year, and that plaintiffs would recoup their original capital investment by the end of the sixth year of their operation of Western Heritage. Thereafter, the pro forma projected a profit of $25,000 per month.

Plaintiffs' affidavit indicates that during their negotiations they learned that even with the infusion of $550,000 of capital into the business, Western Heritage would not meet the minimum capital requirements established under Utah law, and thus could not operate legally in 1985.

Plaintiffs allege in their verified complaint that the Department represented during negotiations that if plaintiffs purchased Western Heritage, the additional capital needed to meet the State's capital requirements would be supplied by the Industrial Loan Guaranty Corporation (ILGC) purchasing $2,000,000 in "net worth certificates" from Western Heritage.[4] Plaintiffs additionally aver, either in their verified complaint or affidavit, that the Department represented that: Use of the net worth certificates was a standard method of rehabilitating distressed thrifts in Utah; the ILGC was financially able to stand behind the net worth certificates; the ILGC was an arm of the State of Utah and, in essence, the ILGC's purchase of the net worth certificates would be supported by the full faith and credit of the State; the issuance and use of the net worth certificates, combined with the amounts plaintiffs would contribute, would raise the amount of Western Heritage's capital to a level that would satisfy the State's capital requirements; the use of the net worth certificates would allow plaintiffs to operate Western Heritage for a sufficient time to work out the financial difficulties existing on December 26, 1984; if plaintiffs met the proposed plan set forth in the pro forma cash flow statement that had been reviewed and accepted by the Department, they would be allowed adequate time to resolve the existing financial difficulties; and, finally, the Department had no information or knowledge which would indicate any reasonable probability of significant error in the then-current balance sheet of Western Heritage.

---

4. Despite their title, the net worth certificates appear to have amounted only to unsecured promissory notes given by Western Heritage to the ILGC, in exchange for the ILGC's promissory notes in the same amount. The right to payment under the certificates was stated to take priority over any right of shareholders to participate in future earnings, which apparently was the basis for concluding the certificates enhanced the capital position of Western Heritage. While the rationale for use of these devices largely eludes us, it is difficult to see how any party to this action was prejudiced by the exchange of promissory notes, since the Department, the Commissioner, the ILGC, Hendricks, and Western Heritage were all parties or signatories to whatever legerdemain the certificates were intended to accomplish.

On December 26, 1984, plaintiffs entered into an agreement with the Department to purchase from Western Heritage all of its stock. On that same date, plaintiffs also entered into a written agreement with the ILGC. The ILGC agreement required the ILGC to (1) purchase a net worth certificate issued by Western Heritage in the sum of $1,000,000; (2) purchase a second net worth certificate issued by Western Heritage in the sum of $250,000 after plaintiffs infused an additional $150,000 into Western Heritage; (3) purchase a third net worth certificate issued by Western Heritage in the sum of $250,000 six months after the plaintiffs invested $150,000, but only if Western Heritage's improvement in net worth was then reasonably close to the projections contained in the pro forma; and (4) purchase a fourth net worth certificate in the amount of $500,000 on or before January 1, 1986, if Western Heritage's improvement in net worth then approximated the projections contained in the pro forma. The net worth certificates were to mature at the rate of $250,000 per year beginning ten years from the date of the first certificate.

Plaintiffs invested $400,000 in cash in Western Heritage and then an additional $150,000 in other assets within ninety days of December 26, 1984, as required by the agreements. During March and April of 1985, plaintiffs obtained a new and final audit of Western Heritage's accounts, books and records, which disclosed that the appropriate reserve for bad debts and anticipated losses should have been well in excess of the amount originally represented by the Department and others. In the period from April through December of 1985, plaintiffs gradually discovered that the Department and others had overstated Western Heritage's actual assets during negotiations. Despite the bleak financial condition, plaintiffs, according to their affidavit, operated Western Heritage with smaller losses than projected in the pro forma, and the ILGC purchased the additional net worth certificates pursuant to the Department's approval with respect to each purchase.

According to plaintiffs' affidavit, in January of 1986, eleven months ahead of the projections made in the final pro forma, Western Heritage began to show a profit. On May 2, 1986, Hendricks and representatives from other thrifts met with Governor Norman H. Bangerter and the Commissioner. During this meeting, Hendricks and other thrift representatives were informed that the ILGC was insolvent and the Department would take control of it on or about July 24, 1986. However, until that time Western Heritage and the other thrifts were to give the appearance of continuing business as usual, although without making new loans.

On June 2, 1986, plaintiffs contend the Commissioner ordered them to stop soliciting or accepting new loans or leasing business for Western Heritage, while still giving the outward appearance of doing business as usual. The Commissioner also informed plaintiffs that the Department intended to close seven thrifts, including Western Heritage; that the Commissioner intended to treat all seven thrifts individually, liquidating two or more and reorganizing three or more; and that it was the Commissioner's recommendation that Western Heritage reorganize. At the time the Commissioner informed plaintiffs of the State's plans, Western Heritage's financial operations were more profitable than they had been when plaintiffs purchased the company. At that time, and at all times thereafter, giving full credit for capital requirement purposes to the net worth certificates issued by Western Heritage, plaintiffs claim that Western Heritage met the capital requirements imposed by State law.

On June 3, 1986, plaintiffs began formulating a reorganization plan for Western Heritage which would have required a partial conversion of depositors' funds to equity. Since the Commissioner intended to treat each thrift individually, plaintiffs believed their reorganization plan would save Western Heritage and allow it to qualify for membership in the Federal Deposit Insurance Corporation (FDIC). The next day, plaintiffs notified the Commissioner of their basic reorganization plan, and the Commissioner indicated she would not object to such a plan.

At the end of June 1986, plaintiffs' plan was presented to FDIC representatives, who

stated that the plan could work and be approved if the Commissioner supported it. On July 15, plaintiffs presented their reorganization plan to the Commissioner, who rejected it. Instead, the Commissioner proposed including Western Heritage in an overall reorganization plan for a new "mega thrift" to be composed of all the ailing thrifts, the remainder of which were in significantly weaker financial positions than Western Heritage.

At the end of July, the Department took possession of the ILGC and concurrently issued an order prohibiting Western Heritage and other thrifts from making payments to any creditors, including depositors, except for depositors with regular savings accounts, who could only withdraw minimal amounts unless for a documented medical or educational emergency.

On August 15, the Commissioner instructed plaintiffs to find a buyer for Western Heritage if they wished to avoid collapse. Plaintiffs contacted potential buyers. When Crossland Mortgage approached the Department about purchasing Western Heritage, the Commissioner informed Crossland it would not be allowed to buy Western Heritage without also buying the other distressed thrifts. Consequently, Crossland terminated any further investigation regarding the potential purchase of Western Heritage.

On September 22, 1986, after filing an ex parte petition with the district court, the Department was authorized and directed by the court to take possession of Western Heritage by an order granting possession. On September 23, Hendricks, as president of Western Heritage, received "Notice of Filing of Petition and Need to File Objections Thereto Within Ten Days." Nearly one month later, on October 21, Brown filed with the district court a petition for judicial review of the seizure of Western Heritage by the defendants, seeking injunctive relief to reverse, set aside, or appropriately modify the action. Nearly two years later, in September of 1988, Brown's petition was dismissed with prejudice because it was not filed within the ten-day period required by Utah Code Ann. § 7–2–3(1) (Supp.1986).

In the prior year, on April 23, 1987, the district court had issued an order approving the liquidation of Western Heritage. The court ruled that the Commissioner had not acted arbitrarily, capriciously, fraudulently, or otherwise contrary to law.[5] A few months later, on December 4, 1987, plaintiffs commenced the action now before us. Defendants answered in March 1988. They filed their motion for summary judgment in January 1991. The motion was granted the following July.

Now on appeal, plaintiffs argue that (1) defendants have breached express and implied obligations contained within the parties' written agreement; (2) defendants have violated plaintiffs' substantive due process rights by violating the taking clause of the Utah Constitution, and violated plaintiffs' procedural due process rights by depriving them of a hearing prior to the taking of Western Heritage; (3) their due process rights were clearly established and thus the Commissioner acted in violation of 42 U.S.C. § 1983; and (4) no aspect of the res judicata doctrine applies so as to bar this action.[6]

---

5. The order recited that

> the Commissioner stipulated to the Court that the State would not assert approval of the proposed plan of liquidation by the Court as a defense to bar any claims against the State, its agencies, departments, officers or employees, by any depositors, creditors, or other[s] who might have claims against the State for losses suffered due to the insolvency of Western Heritage.

6. The res judicata argument is an anticipatory one, raised by plaintiffs because defendants had asserted res judicata as a defense below. Defendants contended that plaintiffs' failure to appeal prior trial court orders bars their present action.

The res judicata argument advanced by defendants below implicates two separate earlier dispositions, the first of which is the order denying Brown's petition for judicial review. This order was premised on two grounds: (1) that the court lacked jurisdiction over the subject matter and the Commissioner and (2) that Brown sought relief not available under Utah Code Ann. § 7–2–3(1) (Supp.1986). In *SMP, Inc. v. Kirkman*, 843 P.2d 531 (Utah App.1992), this court held that before res judicata could apply, "the prior adjudicating tribunal must have had subject matter jurisdiction to adjudicate the claim on its merits." *Id.* at 533.

Furthermore, section 7–2–3, which allows an aggrieved institution or person to apply for an

## STANDARD OF REVIEW

 A challenge to a summary judgment generally "presents for review only conclusions of law because, by definition, cases decided on summary judgment do not resolve factual disputes." *Schurtz v. BMW of North America,* 814 P.2d 1108, 1111 (Utah 1991). Because summary judgment is granted as a matter of law rather than fact, the appellate court is free to reappraise the trial court's legal conclusions. *Winegar v. Froerer Corp.,* 813 P.2d 104, 107 (Utah 1991). The appellate court reviews those conclusions for correctness, without according deference to the trial court. *Country Oaks Condominium Management Comm. v. Jones,* 851 P.2d 640, 641 (Utah 1993); *Allen v. Prudential Property & Casualty Ins. Co.,* 839 P.2d 798, 800 (Utah 1992). This nondeferential standard of review also applies to the threshold issue of whether there are no material issues of fact such that summary judgment is in order.[7] *Neiderhauser Builders & Dev. Corp. v. Campbell,* 824 P.2d 1193, 1196 (Utah App. 1992).

 A number of statutory and contractual provisions require interpretation in the instant case. As to the contract terms, to the extent they are clear and unambiguous, they present questions of law, and we review for correctness. *Kimball v. Campbell,* 699 P.2d 714, 716 (Utah 1985). However, if a contract forms the basis for a summary judgment and the contract is ambiguous, we can affirm only if the extrinsic evidence concerning the parties' intent is undisputed and demonstrates that the successful litigant's position is correct as a matter of law. *Fashion Place Inv., Ltd. v. Salt Lake County,* 776 P.2d 941, 943 (Utah App.), *cert. denied,* 783 P.2d 53 (Utah 1989). The threshold question of whether or not a contract is ambiguous is itself a question of law. *Id.*

 Similarly, the judicial interpretation of statutory provisions poses only questions of law, which we likewise review for correctness. *Berube v. Fashion Centre, Ltd.,* 771 P.2d 1033, 1038 (Utah 1989); *Guardian State Bank v. Lambert,* 834 P.2d 605, 606–07 (Utah App.1992).

## PROCEDURAL POSTURE

Due to the complexity of this case, especially concerning the relevant facts, understanding the procedural posture of the case is key to understanding our decision.

Plaintiffs filed a detailed thirty-page verified complaint on December 4, 1987; defendants answered March 31, 1988. Defendants filed their motion for summary judgment in January of 1991. The statement of facts in defendants' Memorandum in Support of Summary Judgment came almost entirely from plaintiffs' complaint and the controlling agreements. The motion also referred to several exhibits. Because those exhibits were unexpectedly missing from the record, the parties stipulated to supplement the record with them.[8]

injunction within ten days of the seizure of a financial institution, is designed to provide an expeditious procedure for taking over distressed financial institutions. *See In re Bank of San Marino,* 167 Cal.App.3d 247, 261–62, 213 Cal. Rptr. 602, 610–11 (1985); *Dominguez v. Superior Court,* 139 Cal.App.3d 692, 695, 189 Cal.Rptr. 5, 7 (1983); *State Bank of Boyd v. Hatch,* 384 N.W.2d 550, 556 (Minn.App.1986). Applying the res judicata doctrine in the manner urged by defendants would distort the purpose of the statute by effectively reducing the limitations period for all manner of claims to just ten days.

The second disposition with arguable res judicata implications is the order approving the Commissioner's plan of liquidation for Western Heritage, in which the district court concluded that the Commissioner did not act arbitrarily, capriciously, fraudulently, or otherwise contrary to law. The order expressly indicates that the State stipulated it would not assert approval of the liquidation plan as a defense to bar any claims against the State by those who might have claims for losses suffered due to the insolvency of Western Heritage. Consequently, by the very terms of this order, it does not bar the present action.

7. Factual disputes are not invariably fatal to a summary judgment motion. The existence of a dispute concerning even very significant facts does not preclude summary judgment where, for example, no matter which way the facts are resolved, the plaintiff could not establish a basis for recovery. *See Abdulkadir v. Western Pac. R.R.,* 318 P.2d 339, 341 (Utah 1957).

8. These stipulated exhibits consist of the following:

Exhibit A: The December 26, 1984, agreement between the Department and plaintiffs

Despite the parties' apparent agreement on the pertinence of the exhibits relied on in defendants' motion for summary judgment,[9] plaintiffs' memorandum in opposition to summary judgment indicated a thorough disagreement with defendants' statement of material facts. Plaintiffs contended that defendants had summarized the verified complaint in a misleading and incomplete manner. Plaintiffs' memorandum in opposition set out the facts in greater length, basing their version of the facts, as the defendants had, on the verified complaint and, additionally, on an affidavit of Hendricks.

Defendants responded by arguing that their statement of the facts should be deemed admitted.[10] However, no objection or motion to strike was directed to the Hendricks affidavit or the other exhibits submitted by plaintiffs. Instead, defendants articulated what appears to be the only tenable position they could advance—especially considering that their statement of the facts had

been taken from the plaintiffs' verified complaint—namely that "even if all [plaintiffs' facts] are deemed true for purposes of this motion, defendants are entitled to Summary Judgment."

Despite the apparent agreement between the parties concerning the salient exhibits and the reality that both sides base their respective statements of fact largely on the complaint, the papers filed in connection with this appeal demonstrate a thorough disagreement between the parties concerning many important facts and, in particular, the inferences to be drawn therefrom. The dispute revolves primarily around the question of which facts are really relevant and material. Defendants have consistently maintained that most of the facts cited by plaintiffs are irrelevant.

Mindful that our discovery of disputes of material fact will cost them their summary judgment, defendants' primary position re-

and the balance sheet referred to in the agreement;

Exhibit B: The December 26, 1984, agreement between the ILGC and plaintiffs, an unsigned net worth certificate, an unsigned promissory note, a signed certificate setting forth the support the ILGC would provide, and a copy of the December 20, 1984, letter from the ILGC's attorney, Philip C. Pugsley, indicating that no opinion is expressed as to whether there are sufficient assets to enable the ILGC to perform its obligations;

Exhibit C: The December 26, 1984, order by the Commissioner requiring Western Heritage's stock be conveyed to plaintiffs;

Exhibit D: The September 22, 1986, Order granting the Department possession of Western Heritage and a "summons," in the nature of an objection, subsequently served by Brown on the Commissioner, dated October 21, 1986;

Exhibit E: An order of dismissal dated April 5, 1989, concerning the ILGC and the Department in a separate case;

Exhibit F: The order filed September 6, 1988, dismissing Brown's petition for judicial review;

Exhibit G: The affidavit of the Commissioner outlining when she served as Commissioner, that she had signed the December 26 agreement, that she had signed the December 26 order requiring the conveyance of Western Heritage stock to plaintiffs, and that she had petitioned for and received possession of Western Heritage in 1986.

9. In fact, plaintiffs included in their memorandum in opposition some of the same exhibits

defendants used in support of their motion. The additional exhibits consisted of:

Exhibit 1: An amended complaint dated September 27, 1988;

Exhibit 2: A copy of the petition for an order approving possession of Western Heritage and a copy of Hendricks's affidavit in opposition to the motion for summary judgment.

The Hendricks affidavit included, in addition to exhibits already mentioned, the following:

Exhibit 2 of the Hendricks affidavit: A projected balance sheet for Western Heritage;

Exhibit 4 of the Hendricks affidavit: Western Heritage's net worth certificate dated December 31, 1985, in the amount of $500,000;

Exhibit 5 of the Hendricks affidavit: Western Heritage's net worth certificate dated April 1, 1986, in the amount of $250,000.

10. Defendants' response contained several exhibits, some of which had been included with other memoranda. To avoid repetition, we note that the new exhibits consisted of:

Exhibit B: A copy of the petition for judicial review filed by Brown on October 21, 1986, 29 days after the Commissioner took possession of Western Heritage;

Exhibit C: A copy of the notice to file objections within 10 days dated September 23, 1986;

Exhibit D: A copy of the order approving liquidation of Western Heritage dated April 23, 1987, a copy of an order approving the sale of the license of Western Heritage dated May 8, 1987, and a copy of the transcript of the judge's bench ruling on defendants' motion for summary judgment dated May 16, 1991.

mains that plaintiffs simply have no legally cognizable claim for relief. The parties have briefed the matter, both at the trial court and here, as though we are confronted more with a motion to dismiss for failure to state a claim than with a more orthodox summary judgment motion. We shall follow their lead and analyze the case accordingly.

 In so doing, we note that a motion to dismiss for failure to state a claim assumes the accuracy of the facts alleged in the complaint, "but challenges the plaintiff's right to relief based on those facts." *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 196 (Utah 1991). An action will be dismissed for failure to state a claim if it appears "plaintiffs would not be entitled to relief under the facts alleged or under any state of facts they could prove to support their claim." *Prows v. State*, 822 P.2d 764, 766 (Utah 1991). As stated previously, when reviewing a motion to dismiss, the court accepts factual allegations in the complaint as true and all reasonable inferences from those facts are drawn in favor of the plaintiff. *Id.* Because the propriety of dismissal is a question of law, the appellate court gives the trial court's ruling no deference, but reviews for correctness. *St. Benedict's Dev. Co.*, 811 P.2d at 196.

## I. BREACH OF CONTRACT CLAIMS

Plaintiffs assert the Department breached both express and implied provisions of their agreement.

### A. Express Provisions

Two express provisions of the contract are alleged to have been broken: section 2.4 and section 5.1. We treat the former section first.

### 1. Claim Premised on Section 2.4

Section 2.4 states:

SECTION 2—DEPARTMENT'S REPRESENTATIONS. As a direct inducement for the Aquirors to enter into and comply with this Agreement, the Department hereby represents that:

. . . .

2.4 The Department has no information or knowledge which would indicate any reasonable probability of significant error in the current balance sheet for the Thrift, a true and correct copy of which is attached hereto and incorporated herein [by] reference as Exhibit "A".

Plaintiffs allege the Department breached section 2.4 by not disclosing that it had information or knowledge indicative of significant error in the balance sheet of Western Heritage.[11]

Defendants respond to this argument with two lines of reasoning. First, they argue that section 2.4, as its title indicates, is merely a representation and does not actually impose any obligation on the Department. Rather, it is section 3 of the agreement, entitled "DEPARTMENT'S OBLIGATION,"[12] that exclusively forms the basis of the Department's responsibility under the contract and, thereby, its liability for breach of the contract. That is so, contend the defendants, because "[i]mmunity from suit of all governmental entities is waived [only] as to any contractual *obligation*." Utah Code Ann. § 63–30–5(1) (1993) (emphasis added).[13] Section 2.4 is simply a disclaimer of knowledge, defendants assert, and does not rise to the level of a guaranty or other contractual obligation.

11. Plaintiffs have yet to produce any evidence that the Department had information which would indicate, in the curious language of the contract, "any reasonable probability of significant error." However, given the procedural posture of the case, and our focus on whether the complaint states a claim for relief, this is not fatal.

12. Section 3 states:
Upon execution of this Agreement, the Department shall be obligated to enter appropriate and sufficient Findings and Conclusions in support of an Order pursuant to Section 7–2–1(2)(a) and to enter such Order requiring the Thrift and the Holding Company to immediately convey to the Acquirors all the stock of the Thrift. Said Findings, Conclusions and Order are attached hereto as Exhibit "C".

13. As a convenience to the reader when citing to Title 63 we will cite to the current version of the statute. However, our citations to Title 7 shall be to the version in effect at the time of the Commissioner's action, as the parties have done.

Defendants' second argument is that even if section 2.4 were construed to be a misrepresentation, given the facts alleged by plaintiffs the Department could not be held liable for two reasons. First, state agencies are immune from negligent and intentional misrepresentations. Utah Code Ann. § 63–30–10(6) (1993). Immunity is waived "for injury proximately caused by a negligent act or omission of an employee committed within the scope of employment *except* if the injury arises out of ... a misrepresentation by an employee whether or not it is negligent or intentional." *Id.* (emphasis added).

Next, even if defendants were not immune, given the facts pled plaintiffs did not rely on the representation and had at least constructive knowledge of the true facts. Defendants contend plaintiffs had a duty to perform their own examination with due diligence. In addition, they were sophisticated businessmen and were given complete access to all records at Western Heritage, KMG Main Hurdman, and the Department. Moreover, defendants point out, plaintiffs stated in section 4.1 of the contract that they had not been restricted in any significant way from examining and auditing Western Heritage and were satisfied with the accuracy of the financial statements.

Returning to defendants' first argument, which was the position adopted by the trial court, they claim that any misrepresentations which induced plaintiffs to enter into the contract are tort claims from which the State is immune. In response, plaintiffs rely on *Ross v. Consumers Power Co.,* 420 Mich. 567, 363 N.W.2d 641, 674 (1984), for the proposition that the same set of facts may give rise to both a tort and a contract claim, and such duality does not protect the sovereign from the contract claim.[14]

■ For purposes of our analysis we assume, without deciding, that plaintiffs can surmount the sovereign immunity hurdle if they can show an actionable misrepresentation at odds with the recitation in section 2.4. However, in order to succeed on such a claim, plaintiffs would have to reasonably rely upon the representation by the Department that it had "no information or knowledge which would indicate any reasonable probability of significant error in the current balance sheet for the Thrift."[15] *See generally Dugan v. Jones,* 615 P.2d 1239, 1246 (Utah 1980) (listing elements of fraudulent misrepresentation). Plaintiffs are sophisticated businessmen, Brown having significant knowledge of the leasing business, and Hendricks being a certified public accountant. As recited in the contract, plaintiffs were not restricted in any significant way from examining and auditing Western Heritage, its holding company, and/or the Department's records concerning Western Heritage while performing their due diligence examination. The verified complaint reinforces the contract representation that plaintiffs performed their examination of Western Heritage without obstruction. Indeed, KMG Main Hurdman's offices, employees, computers, unsigned audit and software were all made available to plaintiffs. Most importantly, plaintiffs, having had adequate opportunity

**14.** The federal courts have wrestled with the dilemma of whether a cause of action sounds in tort, in which case jurisdiction lies in the district courts, or in contract, in which case jurisdiction lies in the Claims Court (formerly the Court of Claims), unless the amount in issue is below $10,000. 28 U.S.C. §§ 1346, 1491 (Supp.1993). *See* Gregory K. Orme, *Tucker Act Jurisdiction Over Breach of Trust Claims,* 1979 B.Y.U.L.Rev. 855, 858–60 & nn. 14 & 22. While many causes of action can clearly be categorized as tort or contract, Utah law has recognized that "in some cases the acts constituting a breach of contract may also result in breaches of duty that are independent of the contract and may give rise to causes of action in tort." *Beck v. Farmers Ins. Exch.,* 701 P.2d 795, 800 n. 3 (Utah 1985).

**15.** The cases we have uncovered discussing reasonable reliance have dealt with tort claims, such as fraud, and quasi-tort claims, such as estoppel and mistake. *See, e.g., Brown v. Richards,* 840 P.2d 143, 148 (Utah App.1992) (fraud case), *cert. denied,* 853 P.2d 897 (Utah 1993); *Tolboe Constr. Co. v. Staker Paving & Constr.,* 682 P.2d 843, 847 (Utah 1984) (estoppel case). *See also Klas v. Van Wagoner,* 829 P.2d 135, 140–41 & n. 9 (Utah App.) (in action to rescind contract, buyers did not act with reasonable diligence to ascertain truth or falsity of alleged misrepresentation), *cert. denied,* 843 P.2d 1042 (Utah 1992). Assuming a misrepresentation claim can be jimmied into a contract pigeonhole, we can conceive of no reason why the reasonable reliance requirement would not come right along as an integral component of such a claim.

to review the underlying data for themselves, acknowledged in the contract that they were satisfied with the accuracy and completeness of the information in the current balance sheet. Consequently, we hold as a matter of law that under these facts plaintiffs could not have reasonably relied on the statement in section 2.4. They bore the responsibility to satisfy themselves concerning Western Heritage's financial situation, as reflected in its balance sheet, before acquiring ownership of the failing thrift.

### 2. Claim Premised on Section 5.1

Plaintiffs argue that the Department breached section 5.1 by failing to reasonably allow plaintiffs to operate Western Heritage as agreed. Section 5.1 reads:

> SECTION 5—OBLIGATIONS OF THE ACQUIRORS.
>
> Upon execution of this Agreement, the Acquirors shall be obligated to:
>
> 5.1 Assume possession, control, and responsibility for the Thrift immediately following the execution of this Agreement.

Section 5.1 clearly speaks only in terms of *plaintiffs* and their obligations; there is absolutely no mention of the Department's obligations. Plaintiffs, therefore, cannot claim defendants breached the express provisions of section 5.1. Their argument is, in reality, premised on the idea that section 5.1 expressly allowed plaintiffs to possess and operate Western Heritage, from which it may be fairly implied, under all the circumstances, that the Department was required to allow plaintiffs to control Western Heritage for a period long enough to allow them to recover

their investment. We will address this argument, which does not turn on the express language of the contract, when we consider plaintiffs' implied covenants argument.[16]

### B. Implied Covenants

Plaintiffs argue that the Department breached the implied covenant of good faith and fair dealing by failing to allow plaintiffs "to possess and control Western Heritage as agreed," failing to allow or require the ILGC to abide by the terms of its agreement, failing to recognize net worth certificates as the equivalent of cash for capital requirement purposes, and failing to "inform [plaintiffs] of material information."[17]

Defendants argue that the State's waiver of immunity for "contractual obligations," Utah Code Ann. § 63–30–5 (1993), does not include implied covenants. We disagree.

Utah recognizes, as a general principle of contract law, that "every contract is subject to an implied covenant of good faith." *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55–56 (Utah 1991). *Accord St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 199 (Utah 1991) ("covenant of good faith and fair dealing inheres in most, if not all, contractual relationships"). Furthermore, a violation of the duty of good faith and fair dealing "gives rise to a claim for breach of contract." *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 798 (Utah 1985). The State has waived immunity "as to any contractual obligation," Utah Code Ann. § 63–30–5(1) (1993), and thus is liable for its breaches of the covenant of good faith and

---

**16.** Defendants contend that we should not address section 5.1 because it is raised for the first time on appeal. Due to our disposition of this issue, we need not address that contention.

**17.** The material information allegedly consisted of the following: (1) the actual anticipated losses of Western Heritage were substantially in excess of what was represented; (2) the ILGC was insolvent and unlikely to become solvent; (3) the ILGC and the Department had unsuccessfully attempted to prop up thrifts on five prior occasions using "net worth certificates"; (4) the ILGC could not continue to operate as an entity without the participation of financially stronger

thrifts; (5) the Department was encouraging the stronger thrifts to leave the ILGC; (6) the ILGC had inadequate financial reserves to support the net worth certificates; (7) net worth certificates would not be recognized as having any value by the FDIC; (8) the ILGC had never been adequately capitalized; (9) without the active support of the Department, Western Heritage could not survive, and the Department was unable to maintain the level of support needed for an adequate time period; and (10) the ILGC was not part of the Department, its financial obligations were not backed by the Department, and it was not an agency of the State of Utah.

fair dealing implicit in its contracts.[18] *See id.* § 63–30–4(1)(b).

Defendants argue that even if the State is not immune, we should still affirm because, as a matter of law, they did not breach the covenant of good faith and fair dealing. Defendants give several examples as to why their conduct did not violate the covenant. Defendants helped plaintiffs obtain the benefit of their bargain by ordering Western Heritage's stock transferred to plaintiffs, as the "obligation" section [19] of the agreement required. With respect to control and possession of Western Heritage, the allegation of bad faith and unfair dealing "flies in the face of the Verified Complaint," which states that in May of 1986 *plaintiffs* "concluded they could no longer in good faith accept further deposits in Western Heritage, and decided to seek the Department's approval to cease taking deposits." Furthermore, defendants could not have promised to allow plaintiffs to control the thrift for a guarantied period of time because such action would conflict with their statutory duty to regulate the thrift pursuant to Utah Code Ann. §§ 7–2–1 to –20 (1982 & Supp.1986). With respect to plaintiffs' argument concerning the Department's failure to recognize net worth certificates as the equivalent of cash for capital purposes after the ILGC failed, the Department argues it could not do otherwise because the value of the net worth certificates depended on a note and a promise from the ILGC which became worthless when the ILGC failed, and this connection between the value of Western Heritage's assets and the capital

position of the ILGC was clear from the beginning. Finally, the Department argues, with respect to plaintiffs' claim that it should have guarantied the net worth certificates, it cannot guaranty the obligations of a corporation.

▇▇▇▇▇ Defendants' argument, as set forth above, is essentially that no breach of the covenant occurred because of the claimed existence of various facts. This position, however, ignores the principle that whether a breach of the covenant has occurred is ordinarily a question for the jury. *Western Farm Credit Bank v. Pratt,* 860 P.2d 376, 380 (Utah App.1993). "Under the covenant of good faith and fair dealing, each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract." *St. Benedict's Dev. Co. v. St. Benedict's Hosp.,* 811 P.2d 194, 199–200 (Utah 1991) (citations omitted). In order to comply with the duty of good faith,

> a party's actions must be consistent with the agreed common purpose and the justified expectations of the other party. The purpose, intentions, and expectations of the parties should be determined by considering the contract language *and* the course of dealings between and conduct of the parties.

*Id.* at 200 (citations omitted).[20]

▇▇▇▇▇ Determining whether a breach of the covenant has occurred requires a review

---

**18.** The purpose of the covenant is to require that "the duties and rights created by the contract should be performed and exercised in good faith." *Brehany v. Nordstrom, Inc.,* 812 P.2d 49, 55 (Utah 1991). The Restatement provides the following example of the covenant: If A contracts to perform services for B for such compensation "as you, in your sole judgment, may decide is reasonable" and B subsequently refuses to make any determination, A is entitled to the value of the services as determined by a court. Restatement (Second) of Contracts § 205 cmt. d, illus. 6 (1979). In other words, "[g]ood faith limits the exercise of discretion in performance conferred on one party by the contract." Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith,* 94 Harv. L.Rev. 369, 372–73 (1980). "[A] party may deprive the other of these anticipated benefits for a legitimate (or good faith) reason. The same act

will be a breach of the contract if undertaken for an illegitimate (or bad faith) reason." *Id.* at 373. The covenant is not intended to open a "Pandora's box" of liability, but rather is meant to ensure that the spirit of the contract is fulfilled. Arthur L. Corbin, *Corbin on Contracts* § 654A(E)(4) at 91 (Supp.1993).

**19.** The text of this section is set forth in note 12.

**20.** We hasten to add that such a covenant must not be construed to establish new independent rights or duties not agreed upon by the parties. *Brehany v. Nordstrom, Inc.,* 812 P.2d 49, 55 (Utah 1991). "Nor can a covenant of good faith be used to nullify a right granted by a contract to one of the parties or to require a party vested with a contract right to exercise that right in a manner contrary to that party's legitimate self-interest." *Id.*

of more than just the text of the contract itself. *See id.* ("An examination of express contract terms alone is insufficient to determine whether there has been a breach of the implied covenant of good faith and fair dealing."). This broad review required to determine whether a breach has occurred is generally one of fact, not law, and thus is ordinarily left to the jury or finder of fact. Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith,* 94 Harv.L.Rev. 369, 370 n. 6 (1980). *See Berube v. Fashion Centre, Ltd.,* 771 P.2d 1033, 1046 (Utah 1989) ("The scope of the implied covenant is determined by the factual setting in which it is found. Indeed, where the reasonable expectations of the parties are met, there is no breach."). *But see* Arthur L. Corbin, *Corbin on Contracts* § 654B (Supp.1993) (noting that while "good faith always involves questions of fact, ... it often involves questions of law").

Previously in this opinion, we set out in some detail why this appeal is tantamount to review of an order of dismissal for failure to state a claim. As noted, a complaint will be dismissed for failure to state a claim only if it appears plaintiff would not be entitled to relief under the facts alleged or any state of facts which could be proven to support the claim. As stated above, the question of whether there has been a breach of the covenant of good faith is primarily one of fact. And as previously noted, many of the key historical facts, and the inferences fairly to be drawn therefrom, are in dispute.

 Defendants make some persuasive points and we have our doubts as to whether plaintiffs can succeed in showing that the covenant has been broken. However, those arguments unavoidably involve questions of fact and must therefore be made to the factfinder rather than to this court. Plaintiffs have alleged facts which, at least under the liberal requirements of notice pleading, state a claim for breach of the implied covenant of good faith and fair dealing, the thrust of which is that defendants wrongfully subverted plaintiffs' opportunity to realize the benefit of their bargain.[21]

## II. CONSTITUTIONAL CLAIMS

Plaintiffs' fifth cause of action alleges that "[o]n September 23, 1986, the Department took possession of [plaintiffs'] ownership interest in Western Heritage in violation of Article I, § 7 of the Constitution of Utah, without due process of law." Article I, section 7 states: "No person shall be deprived of life, liberty or property, without due process of law." Plaintiffs argue that section 7 was violated in two separate ways: First, there was a violation of substantive due process because defendants' conduct effected a taking for a public purpose without just compensation and, second, a procedural due process violation occurred because defendants did not give plaintiffs a hearing prior to taking their property.

### A. Substantive Due Process and Taking

 As to the first claim, plaintiffs argue that count five basically states a claim for a taking under Article I, section 22 of the Utah Constitution, even though the complaint only refers to the due process clause of Article I, section 7.[22] Article I, section 22

21. One of plaintiffs' subtheories of how the covenant was breached may be definitively resolved on this appeal and need not await consideration by the factfinder. One of the items of material information plaintiffs claim defendants did not provide was the actual anticipated losses of Western Heritage, which plaintiffs contend were substantially in excess of what was represented. *See* note 17, numeral 1. This is simply an attempt to litigate what we have already held could not be litigated under section 2.4 of the agreement. As indicated, the covenant may not be used as a device for rewriting the express provisions of a written agreement.

We also note that in recognizing that plaintiffs state a cause of action in contract, albeit one more limited than they had hoped to state, the entire range of contract doctrines comes into play. Yet to be resolved are questions such as proof of their damages, *see, e.g., Jenkins v. Morgan,* 123 Utah 480, 260 P.2d 532, 535 (1953) (prospective profits from unestablished business generally too speculative to form basis for recovery), and the adequacy of their mitigation efforts. *See generally John Call Eng'g, Inc. v. Manti City Corp.,* 795 P.2d 678, 680–81 (Utah App.1990).

22. Plaintiffs seem to argue that a claim of unconstitutional taking without just compensation is merely a species of due process violation, which they clearly alleged. In support of this argument they cite *Zinermon v. Burch,* 494 U.S. 113, 126,

states: "Private property shall not be taken or damaged for public use without just compensation."

Plaintiffs' argument ignores the fact that their detailed thirty page amended complaint does not so much as mention section 22. The complaint refers only to section 7, albeit with some unfocused verbiage about taking, and despite plaintiffs' creative effort to expand their fifth cause of action to include a section 22 claim under a due process rubric, it is clear that the complaint does not state a section 22 cause of action for a taking.

At best, and even under a liberal view of notice pleading, the gravamen of this part of the complaint seems to be that because defendants took Western Heritage in violation of section 7, compensation is available—perhaps under the unpled section 22. Because no section 7 violation exists, as explained in the next section, we need not reach the issue of whether damages would be available for such a violation, under section 22 or otherwise.

### B. Procedural Due Process

Plaintiffs' second constitutional argument is that they were deprived of any opportunity to be heard prior to the taking of Western Heritage, in violation of their procedural due process rights. Plaintiffs do not allege that the Commissioner failed to follow the provisions of the applicable statute or that the statute itself is unconstitutional. Rather, plaintiffs contend these statutory procedures are limited, as a matter of due process, until the Commissioner shows there is an "emergency."

While procedural due process normally requires a pre-seizure hearing, exceptions to the rule have arisen in several situations. The United States Supreme Court has recognized three requirements which, if met, obviate the necessity of a pre-seizure hearing. First, the seizure must be "directly neces-sary to secure an important governmental or general public interest." *Fuentes v. Shevin,* 407 U.S. 67, 91, 92 S.Ct. 1983, 2000, 32 L.Ed.2d 556 (1972). Second, there must be "a special need for very prompt action." *Id.* Third, the state must have "kept strict control over its monopoly of legitimate force," i.e., the person initiating the seizure must be "a government official responsible for determining, under the standards of a narrowly drawn statute, that immediate seizure was necessary and justified in the particular instance." *Id.*

One of the very situations cited by the *Fuentes* court as ordinarily satisfying the above criteria is the necessity of protecting against the economic disaster of a bank failure. *Id.* at 91–92, 92 S.Ct. at 2000 (citing *Fahey v. Mallonee,* 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947)). In *Fahey,* the Supreme Court observed that "the delicate nature of the institution and the impossibility of preserving credit during an investigation [have] made it an almost invariable custom to apply supervisory authority in this summary manner." 332 U.S. at 253, 67 S.Ct. at 1556.

More recently, the Supreme Court of Alaska stated quite sweepingly that "the federal due process clause does not require a pre-seizure hearing when a state seizes a bank." *Hoffman v. State Dep't of Commerce,* 834 P.2d 1218, 1219 n. 2 (Alaska 1992). The First Circuit has likewise recognized that "[t]he drastic consequences of bank failure or mismanagement and 'the impossibility of preserving credit during an investigation' call for prompt and decisive action and place this proceeding among the 'extraordinary situations' in which notice and hearing may be postponed until after seizure." *Roslindale Co-op Bank v. Greenwald,* 638 F.2d 258, 260 (1st Cir.) (quoting *Fahey,* 332 U.S. at 253, 67 S.Ct. at 1556), *cert. denied,* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 108 (1981). One federal district court has gone so far as to say, in a

110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990), for the proposition that the due process clause of the Fourteenth Amendment incorporates provisions of the Bill of Rights. Of course, the Due Process clause of the Fourteenth Amendment has been construed to make applicable to the states various provisions of the Bill of Rights which, by their terms, only limit the powers of the federal government. This rationale has no application in construing the provisions of a state constitution. In construing a state constitution containing its own rather complete "bill of rights," it is wholly unnecessary to view a due process guaranty as connoting other rights when those rights are explicitly set forth in the same document.

similar case, that the "[p]laintiffs' claim that they were denied procedural due process is frivolous. Summary seizure of a bank—i.e., seizure without a prior hearing—has been approved by many courts, including the Supreme Court of the United States, on the ground such action is justified by the potential economic disaster of a bank failure." *Gregory v. Mitchell*, 459 F.Supp. 1162, 1165–66 (D.Ala.1978).

■ The summary seizure of Western Heritage fully conforms with the precepts of the cases cited. The seizure of a failing thrift is in the public interest, and prompt action is necessary. Most importantly, the Commissioner seems to have adhered to the strict statutory requirements and there has been no serious allegation to the contrary. Pursuant to Utah Code Ann. § 7–2–1 (Supp. 1986), the Commissioner may take possession of an institution with or without a court order when certain criteria are met.[23] Those criteria do not include an "emergency" in the rigid sense that plaintiffs contemplate. The statute also requires the Commissioner to petition the district court to provide the court with supervisory jurisdiction to review the actions of the Commissioner.[24] The Commissioner complied with these requirements.

On September 22, 1986, the Commissioner filed a petition in district court to provide the court with supervisory jurisdiction to review her actions. She also requested an order authorizing and directing the Commissioner to take possession of Western Heritage. The court granted the petition because it appeared the Commissioner had found:

(1) Western Heritage [was] insolvent under the definition contained in Title 7; and

(2) The remedies provided under Title 7 were impracticable or ineffective to protect the interests of Western Heritage's depositors, creditors, stockholders and other parties in interest.

The next day, Larry R. Hendricks, as president of Western Heritage, was served with notice that the petition for possession had been filed and that any objection should be lodged within ten days.[25] An objection would allow the court, after inviting the Commissioner to show cause why further pro-

---

**23.** Section 7–2–1 provides in relevant part:

(1) An institution under the jurisdiction of the department shall be subject to supervisory actions by the commissioner under the chapter ... if the commissioner, with or without an administrative hearing, finds that:
....
(f) a depository institution ... has or is about to become insolvent;
....
(2) If the commissioner finds that any of the conditions set forth in Subsections 7–2–1(1)(a) through (j) exist ..., and if the commissioner also finds that an order issued pursuant to Section 7–1–307, 7–1–308, or 7–1–313 would not adequately protect the interests of the institution's depositors, creditors, members, or other interested persons from all dangers presented by the conditions found to exist ..., [she] may:
....
(b) take possession of the institution or other person subject to the jurisdiction of the department with or without a court order, if an acquisition of control of, a merger with, an acquisition of all or a portion of the assets of, or an assumption of all or a portion of the liabilities of the institution or other person without taking possession does not appear to [her] to be practicable.

Utah Code Ann. § 7–2–1 (Supp.1986).

**24.** Utah Code Ann. § 7–2–2 (Supp.1986) states:

The district court ... has jurisdiction in the liquidation or reorganization of the institution or other person of which the commissioner has taken possession under Subsection 7–2–1(2)(b). Before taking possession of an institution or other person under [her] jurisdiction, or within a reasonable time after taking possession of an institution or other person without court order, as provided in this chapter, the commissioner shall cause to be commenced in the appropriate district court, an action to provide the court supervisory jurisdiction to review the actions of the commissioner.

**25.** Utah Code Ann. § 7–2–3 (Supp.1986) states, in part:

(1) Whenever any institution or other person considers itself aggrieved by the taking under Subsection 7–2–1(2)(b), it may within 10 days after the taking apply to the court to enjoin further proceedings, and the court, after citing the commissioner to show cause why further proceedings should not be enjoined and after hearing the allegations and proofs of the parties and determining the facts, may dismiss the application or, if the court finds the taking to be arbitrary, capricious, an abuse of discretion or otherwise contrary to law, enjoin the commissioner from further proceedings and direct [her] to surrender possession in such manner and upon such terms as the court may designate in the public interest.

ceedings should not be enjoined and hearing the allegations and proofs of the parties, to enjoin the Commissioner if the court found "the taking to be arbitrary, capricious, an abuse of discretion or otherwise contrary to law." Utah Code Ann. § 7–2–3 (Supp.1986). However, plaintiffs did not file an objection within ten days.

Section 7–2–3 is similar to the statutes in several other states. *See, e.g.,* Cal.Fin.Code § 3101 (West 1989); Mass.Ann.Laws ch. 167, § 33 (Law.Co-op.1987); N.Y. Banking Law § 607 (McKinney 1971). Our attention has been called to no cases holding such banking statutes, which allow for seizure without hearing when accompanied by the opportunity for post-seizure review, to be unconstitutional. Plaintiffs have not alleged that the Commissioner failed to follow the statutory requirements. In fact, plaintiffs were given notice of the seizure and of the requirement that any objection had to be filed within ten days.

Neither plaintiff objected within the allotted time, and in fact Hendricks apparently agreed to continue to run the thrift after the seizure. If plaintiffs believed the Commissioner's actions were contrary to law, plaintiffs could have objected within ten days. They did not object and, having foregone their opportunity to do so and secure timely judicial review of the Commissioner's actions, they will not now be heard to complain that prior to implementing the statutory scheme for seizing a thrift, the Commissioner must first determine that an emergency existed.

## III. CLAIM UNDER 42 U.S.C. § 1983

■■■ Plaintiffs' fourth cause of action asserts a claim under 42 U.S.C. § 1983[26] against the Commissioner.[27] This claim is predicated upon two allegations: First, that by exceeding her legal authority in November and December of 1984, the Commissioner thereby, and under color of law, induced plaintiffs to purchase Western Heritage under circumstances which violated their rights to due process and equal protection under the United States Constitution; and second, that by causing the business of Western Heritage to be taken from plaintiffs in September of 1986 under color of law, the Commissioner also violated the plaintiffs' rights to due process and equal protection.

■■■ Defendants argue that the Commissioner is protected by the doctrine of qualified immunity. A governmental official is qualifiedly immune from liability if the conduct alleged in the complaint did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "It is the plaintiff's burden to convince the court that the law was clearly established." *Hilliard v. City & County of Denver,* 930 F.2d 1516, 1518 (10th

---

**26.** 42 U.S.C. § 1983 provides in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**27.** The claim is asserted against the Commissioner in her individual capacity. In *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the Supreme Court held that "neither a State nor its officials acting in their *official capacities* are 'persons' under § 1983." 491 U.S. at 71, 109 S.Ct. at 2312 (emphasis added). The Supreme Court later clarified any possible ambiguity by holding in *Hafer v. Melo,* —— U.S. ——, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991), that "state officials, sued in their *individual capacities,* are 'persons' within the meaning of § 1983." *Id.* at ——, 112 S.Ct. at 359 (emphasis added).

Though a complaint often does not clearly specify whether an official is sued in an individual or official capacity, *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985), and several methods exist for making this determination, *Hafer,* —— U.S. at ——, 112 S.Ct. at 361, *Graham,* 473 U.S. at 167 n. 14, 105 S.Ct. at 3106 n. 14, defendants apparently concede that the Commissioner is being sued in her personal capacity since the only defense they present is that she is qualifiedly immune. Qualified immunity is a personal-capacity defense, whereas the immunities principally to be claimed in an official-capacity action are forms of sovereign immunity. *Graham,* 473 U.S. at 166–67, 105 S.Ct. at 3105–06.

Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 656, 116 L.Ed.2d 748 (1991). A clearly established right, for purposes of qualified immunity, is not simply the mere existence of a well-known constitutional right. The United States Supreme Court has rejected broad definitions of a clearly established right and, instead, has stated:

> The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading.... It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

*Anderson v. Creighton,* 483 U.S. 635, 639–40, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987) (citations omitted).

▆▆ Plaintiffs' complaint simply states that the Commissioner violated their "rights to due process and equal protection under the United States Constitution" with respect to the 1984 agreement and the 1986 takeover. In their brief, plaintiffs argue that procedural due process is the clearly-established law of the land, relying on *Fuentes v. Shevin,* 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972), and *Boddie v. Connecticut,* 401 U.S. 371, 375, 91 S.Ct. 780, 784, 28 L.Ed.2d 113 (1971).

Plaintiffs' approach ignores the particularized showing required by *Anderson*. It also ignores the fact that in the highly regulated industry of banking, states regularly allow the seizure of an institution before notice is given pursuant to carefully developed statutory provisions. *See, e.g.,* Cal.Fin.Code § 3101 (West 1989); Mass.Ann.Laws ch. 167, § 33 (Law.Co-op.1987); N.Y. Banking Law § 607 (McKinney 1971). *See also Fahey v. Mallonee,* 332 U.S. 245, 250, 253, 67 S.Ct. 1552, 1554, 1556, 91 L.Ed. 2030 (1947) (observing that "banking is one of the longest regulated and most closely supervised of public callings" and that "the delicate nature of the institution and the impossibility of preserving credit during an investigation has made it an almost invariable custom to apply supervisory authority" in a "summary manner" by allowing the conservator to take possession before providing a hearing); *Gregory v. Mitchell,* 459 F.Supp. 1162, 1165–66 (D.Ala.1978) ("Summary seizure of a bank—i.e., seizure without a prior hearing—has been approved by many courts, including the Supreme Court of the United States, on the ground such action is justified by the potential economic disaster of a bank failure.").

The Commissioner followed statutory procedures, of the sort regularly upheld by the courts, prior to petitioning the district court ex parte and being ordered by that court to take possession of Western Heritage. Plaintiffs simply have not shown, even at the level of notice pleading, that the Commissioner acted in a manner "that a reasonable official would understand" to be in violation of a "clearly established" right. *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039.[28]

---

**28.** Insofar as plaintiffs' section 1983 claim is not premised on procedural due process, but rather on substantive due process, it is without merit and we decline to address it. *See State v. Carter,* 776 P.2d 886, 889–90 (Utah 1989); *State v. Vigil,* 840 P.2d 788, 795 (Utah App.1992), *cert. denied,* 857 P.2d 948 (Utah 1993).

**570**

## CONCLUSION

The court's judgment dismissing all claims against the Commissioner is affirmed. The judgment dismissing all claims against the Department. is affirmed, excepting only the claim premised on breach of the covenant of good faith and fair dealing, which covenant is a part of the parties' agreement by operation of law. While recognizing the distinct possibility that pursuit of such a claim will be ultimately unavailing, we are constrained to conclude that plaintiffs have adequately stated such a claim and remand that claim for trial or such other proceedings as may now be in order.

JACKSON, J., concurs.

BENCH, J., concurs, except that as to section I(B), concurs only in the result.